ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

LUTHER L. HAJEK (CO Bar # 44303)
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
999 18th Street, North Terrace, Suite 600
Denver, CO 80202
Tel: (303) 241-0826 / Fax: (303) 844-1350
luke.hajek@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, President of the United States, *et al.*,<br><br>    Defendants,<br><br>    and<br><br>AMERICAN PETROLEUM INSTITUTE, *et al.*,<br><br>    Intervenor-Defendants. | No. 3:25-cv-00038-SLG<br>Honorable Sharon L. Gleason<br><br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |

*Northern Alaska Environmental Center v. Trump, et al.*      No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.

Case 3:25-cv-00038-SLG    Document 57-1    Filed 01/16/26    Page 1 of 42

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    I.     The Outer Continental Shelf Lands Act ......................................................... 2

    II.    President Biden's Withdrawal of Areas of the OCS from Oil and Gas Leasing and President Trump's Rescission of Those Withdrawals ............. 5

    III.   BOEM's Five-Year Program ........................................................................ 8

LEGAL STANDARD FOR A MOTION TO DISMISS ................................................... 9

ARGUMENT ......................................................................................................... 11

    I.     Plaintiffs Lack Standing and Their Claims Are Not Ripe ........................... 11

          A.    Plaintiffs Have Failed to Demonstrate Standing ............................. 11

          B.    Plaintiffs Have Failed to Plead Ripe Claims .................................... 17

    II.    Plaintiffs' Claims Against the President Fail for Lack of a Waiver of Sovereign Immunity and Right of Action ................................................... 21

          A.    Plaintiffs' Claims Are Barred by Sovereign Immunity ................... 21

          B.    Plaintiffs Have No Right of Action .................................................. 28

    III.   Plaintiffs' Claims Against the Secretary of the Interior and Secretary of Commerce Fail for Lack of Final Agency Action .................................. 31

CONCLUSION ...................................................................................................... 34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ................................................................................................ 17

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ..................................................................................... 26, 27, 28

*Alexander v. Trump*,
139 S. Ct. 1200 (2019) ............................................................................................ 28

*Alexander v. Trump*,
753 F. App'x 201 (5th Cir. 2018) ........................................................................... 28

*Al-Haramain Islamic Foundation, Inc. v. Obama*,
705 F.3d 845 (9th Cir. 2012) ............................................................................ 20, 22

*Aminoil U.S.A., Inc. v. California Water Resources Board*,
674 F.2d 1227 (9th Cir. 1982) ................................................................................ 25

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........................................................................................... 28, 29

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ................................................................................................ 14

*Ball v. Rodgers*,
492 F.3d 1094 (9th Cir. 2007) ................................................................................ 27

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................ 30

*Block v. North Dakota*,
461 U.S. 273 (1983) ................................................................................................ 23

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (2024) ............................................................................................. 10

*California v. Watt*,
668 F.2d 1290 (D.C. Cir. 1981) .............................................................................. 18

*Center for Biological Diversity v. U.S. Department of Interior*,
563 F.3d. 466 (D.C. Cir. 2009) ......................................................................... 18, 19

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,

*Northern Alaska Environmental Center v. Trump, et al.*                No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                                   ii

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 3 of 42

333 U.S. 103 (1948) ..................................................................................................... 23

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .................................................................................................. 10

*Columbia Riverkeeper v. U.S. Coast Guard,*
761 F.3d 1084 (9th Cir. 2014) ................................................................................ 31

*Consejo de Desarollo Economico De Mexicali, A.C. v. United States,*
482 F.3d 1157 (9th Cir. 2007) ................................................................................ 20

*Ctr. for Sustainable Econ. v. Jewell,*
779 F.3d 588 (D.C. Cir. 2015) ........................................................................ 2, 3, 4

*Dakota Central Tele. Co. v. S. Dakota ex rel Payne,*
250 U.S. 163 (1919) .................................................................................................. 23

*Dalton v. Specter,*
511 U.S. 462 (1994) ...................................................................................... 23, 25, 26

*Davis v. Passman,*
442 U.S. 228 (1979) .................................................................................................. 29

*Douglas v. Independent Living Center of Southern California, Inc.,*
565 U.S. 606 (2012) .................................................................................................. 29

*Dunn v. Black, P.S. v. United States,*
492 F.3d 1084 (9th Cir. 2007) ................................................................................ 20

*E.V. v. Robinson,*
906 F.3d 1082 (9th Cir. 2018) ...................................................................... 22, 23, 30

*FDIC v. Meyer,*
510 U.S. 471 (1994) .................................................................................................. 20

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ...................................................................................... 21, 25, 27

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
561 U.S. 477 (2010) .................................................................................................. 29

*Friends of the Earth v. Sanderson Farms, Inc.,*
992 F.3d 939 (9th Cir. 2021) .................................................................................... 9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167 (2000) .................................................................................................. 11

*Gallo Cattle Co. v. U.S. Dept. of Agric.,*
159 F.3d 1194 (9th Cir. 1998) ................................................................................ 20

*Havasupai Tribe v. Provencio*,
  906 F.3d 1155 (9th Cir. 2018) ........................................................................ 31

*Kunaknana v. U.S. Army Corp. of Eng'rs*,
  23 F. Supp. 3d 1063 (D. Alaska 2014) ........................................................... 12

*Lane v. Pena*,
  518 U.S. 187 (1996).......................................................................................... 20

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949)..........................................................22, 23, 25, 27, 28

*League of Conservation Voters v. Trump*,
  303 F. Supp. 3d 985 (D. Alaska 2018) .............................................................. 7

*League of Conservation Voters v. Trump*,
  363 F. Supp. 3d 1013 (D. Alaska 2019) ............................................................ 7

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014) ................................................................... 9, 10

*Lonberg v. City of Riverside*,
  571 F.3d 846 (9th Cir. 2009) .......................................................................... 27

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)..................................................................................... 10, 13

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)........................................................................................... 17

*McCarthy v. United States*,
  850 F.2d 558 (9th Cir. 1988) ............................................................................. 9

*Murphy Co. v. Biden*,
  65 F.4th 1122 (9th Cir. 2023) .......................................................................... 25

*Nat'l Park Hospitality Ass'n v. Dept. of the Interior*,
  538 U.S. 803 (2003)..................................................................................... 16, 17

*Native Village of Point Hope v. Jewell*,
  740 F.3d 489 (9th Cir. 2014) ............................................................................. 4

*Navajo Nation v. Dept. of the Interior*,
  876 F.3d 1144 (9th Cir. 2017) ......................................................................... 30

*North Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980)......................................................................... 18

*Ohio Forestry Ass'n v. Sierra Club*,

*Northern Alaska Environmental Center v. Trump, et al.*                    No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                                        iv

523 U.S. 726 (1998) ...................................................................................................... 17

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
465 F.3d 977 (9th Cir. 2006) ....................................................................................... 31

*Pacific Operators Offshore, LLP v. Valladolid*,
132 S. Ct. 680 (2012) .................................................................................................... 2

*Pennhurst State School & Hospital v. Halderman*,
465 U.S. 89 (1984) ...................................................................................................... 22

*Secretary of Interior v. California*,
464 U.S. 312 (1984) ............................................................................................... 18, 19

*Sierra Forest Legacy v. Sherman*,
646 F.3d 1161 (9th Cir. 2011) ..................................................................................... 16

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ................................................................................... 10, 11, 12, 13

*Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*,
594 F.2d 730 (9th Cir. 1979) ......................................................................................... 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................................................................................................... 10

*Tribal Village of Akutan v. Hodel*,
869 F.2d 1185 (9th Cir. 1988) ..................................................................................... 19

*United States v. Louisiana*,
363 U.S. 1 (1960) .................................................................................................. 2, 3, 8

*United States v. Mottaz*,
476 U.S. 834 (1986) .................................................................................................... 20

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
412 U.S. 669 (1973) .................................................................................................... 13

*United States v. Testan*,
424 U.S. 392 (1976) .................................................................................................... 20

*United States v. Yakima Tribal Court*,
806 F.2d 853 (9th Cir. 1986) ................................................................................. 24, 25

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*,
535 U.S. 635 (2002) .................................................................................................... 29

*Village of False Pass v. Clark*,
733 F.2d 605 (9th Cir. 1984) ....................................................................................... 19

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................ 14

*Whitewater Draw Natural Res. Cons. Dist. v. Mayorkas*,
    5 F.4th 997 (9th Cir. 2021) ................................................................... 32

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ................................................................... 10, 14, 16

*Wilderness Soc'y v. Rey*,
    622 F.3d 1251 (9th Cir. 2010) .............................................................. 12, 13

**Statutes**

43 U.S.C. § 1312 .............................................................................................. 3

43 U.S.C. § 1331(a) ..................................................................................... 2, 26

43 U.S.C. § 1340 ........................................................................................... 15

43 U.S.C. § 1340(a) ........................................................................................ 7

43 U.S.C. § 1341(a) ................................................................................. 5, 24, 27

43 U.S.C. § 1344 ...................................................................................... 4, 5, 18

43 U.S.C. § 1349 ........................................................................................ 22, 27

43 U.S.C. § 1349(a) ....................................................................................... 21

43 U.S.C. §§ 1301(b) ....................................................................................... 2

43 U.S.C. §§ 1331-1356(c) ................................................................................ 3

5 U.S.C. § 702 ................................................................................. 20, 21, 27, 30

5 U.S.C. § 704 ............................................................................................... 30

5 U.S.C. §§ 701-06 ......................................................................................... 30

Pub. L. No. 212, Ch. 345 § 4(b), 67 Stat. 462, 463 (Aug. 7, 1953) ................................. 21

Pub. L. No. 95-372, § 208, 92 Stat. 629, 657-59 (Sept. 18, 1978) .................................. 21

**Rules**

Fed. R. Civ. P. 12(b)(1) .................................................................................... 9

**Regulations**

10 Fed. Reg. 12,303 (Sept. 28, 1945) ...................................................................... 3

30 C.F.R. pt. 551 ........................................................................................ 5, 15

*Northern Alaska Environmental Center v. Trump, et al.*    No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.    vi

Case 3:25-cv-00038-SLG    Document 57-1    Filed 01/16/26    Page 7 of 42

82 Fed. Reg. 20,815 (May 3, 2017)........................................................................ 7

86 Fed. Reg. 7,037 (Jan. 20, 2021)..................................................................... 7, 8

90 Fed. Reg. 6,739 (Jan. 6, 2025)................................................5, 6, 8, 11, 14, 15, 24

90 Fed. Reg. 8,237 (Jan. 20, 2025).................................................................... 6, 7

90 Fed. Reg. 8433 (January 20, 2025)................................................................. 31

**Other Authorities**

1953 U.S.C.C.A.N. 2177 ...................................................................................... 4

U.S. Const. art. II ............................................................................................... 26

## INTRODUCTION

Plaintiffs' Second Amended Complaint ("Complaint") should be dismissed for lack of jurisdiction. In January 2025, just prior to the change in administration, former President Biden issued sweeping memoranda withdrawing large areas of the Arctic, Atlantic and Pacific Oceans, and the Gulf of America from oil and gas leasing. Upon taking office, President Trump decided to reverse those actions, returning those areas to the status they had occupied just two weeks before. Plaintiffs claim that it was unlawful for President Trump to reverse the withdrawals and that only Congress can do so. Plaintiffs are wrong on the merits, but the case should not get to that stage because their Complaint fails on multiple jurisdictional grounds.

It is a basic prerequisite to bringing a lawsuit that a plaintiff must establish an actual case or controversy under Article III of the Constitution. Plaintiffs fail this requirement because they have not pled any harms resulting from President Trump's decision to rescind the withdrawals. The Complaint generally describes impacts that could occur from oil and gas exploration and development, but lacks any allegation that such impacts are actually occurring or will imminently occur. Therefore, Plaintiffs lack standing. For similar reasons, Plaintiffs' claims are not ripe—they have not shown that their interests are affected by any oil and gas activities caused by President Trump's reversal. To the contrary, numerous steps remain before their interests could be affected under the multi-stage leasing and development process set out in the Outer Continental Shelf Lands Act ("OCSLA").

*Northern Alaska Environmental Center v. Trump, et al.*     No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.     1

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 9 of 42

Plaintiffs' claims against the President must also be dismissed because they are barred by sovereign immunity. The waiver of sovereign immunity in the Administrative Procedure Act ("APA") is not available based on well-established precedent; and Plaintiffs cannot evade that precedent by recasting their claims as so-called *ultra vires* claims. In addition, they lack a right of action to sue the President. The APA right of action is not available, and the right of action in OCSLA is limited to other types of claims. The Supreme Court has made clear that a plaintiff must have a right of action, even for constitutional claims, and Plaintiffs have not pled one.

Finally, the claims against the Secretary of the Interior and the Secretary of Commerce must be dismissed because the Complaint identifies no final action taken by either cabinet secretary.

## BACKGROUND

### I.      The Outer Continental Shelf Lands Act

The Outer Continental Shelf ("OCS") of the United States "is a vast underwater expanse nearly equal in size to the Australian continent." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015). The OCS includes "all submerged lands lying seaward" of coastal state jurisdiction. 43 U.S.C. § 1331(a); *see also Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 685 (2012). For most coastal states (except those adjacent to Texas, the Gulf coast of Florida, and certain states where the line has become fixed and no longer adjusts with the coastline), the inward boundary of the outer continental shelf begins three nautical miles from the coastline. 43 U.S.C. §§

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                                    2

Case 3:25-cv-00038-SLG      Document 57-1      Filed 01/16/26      Page 10 of 42

1301(b), 1312; *United States v. Louisiana*, 363 U.S. 1, 66 (1960); *United States v. Florida*, 363 U.S. 121, 129 (1960). The outer boundary of the OCS shelf extends roughly two hundred nautical miles into the ocean to the seaward limit of the international-law jurisdiction of the United States. 43 U.S.C. § 1312; *Ctr. for Sustainable Econ.*, 779 F.3d at 592.

In 1945, President Truman, recognizing the "long range world-wide need for new sources of petroleum and other minerals," exercised the United States' control over the natural resources of the OCS by issuing the "Truman Proclamation." Proclamation No. 2667, 10 Fed. Reg. 12,303 (Sept. 28, 1945). The Proclamation informed other nations that:

> the Government of the United States regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control.

*Id.* Shortly thereafter, President Truman issued another Executive Order to reserve and set aside the Outer Continental Shelf's natural resources under the jurisdiction and control of the Secretary of the Interior. Exec. Order 9633, 10 Fed. Reg. 12,305 (Oct. 2, 1945).

In 1953, Congress enacted OCSLA, which governs the management of mineral resources on the OCS. *See* 43 U.S.C. §§ 1331-1356(c). In passing OCSLA, Congress declared that the oil and gas reserves beneath the OCS are "a vital national resource . . . which should be made available for expeditious and orderly development, subject to

environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.* § 1332(3). A congressional report issued upon OCSLA's enactment similarly declared that: "The principal purpose of [OCSLA] is to authorize the leasing by the Federal Government of [] the shelf." H.R. Rep. No. 413, 83rd Congress, 1st Sess. (1953), *reprinted in* 1953 U.S.C.C.A.N. 2177, 2178.

Consistent with this purpose, OCSLA sets forth a four-stage process to allow development of oil or gas: (1) the Department of the Interior prepares a five-year program of proposed lease sales across the OCS, *see* 43 U.S.C. § 1344; (2) the Department may hold lease sales and issues leases in accordance with the program, *see id.* §§ 1337(a), 1344(d); (3) the Department reviews the lessee's exploration plans, *see id.* § 1340; and (4) the Department, in consultation with state and local governments, reviews the lessee's development plans. *See id.* § 1351; *see also Native Village of Point Hope v. Jewell,* 740 F.3d 489, 493 (9th Cir. 2014); *Ctr. for Sustainable Econ.*, 779 F.3d at 594.

The five-year leasing program must address the nation's energy needs for a five-year period and "serves as the template for the Government's leasing of drilling rights on the [Shelf] for the five-year period following its preparation." *Ctr. for Sustainable Econ.*, 779 F.3d at 592 n.6; *see also* 43 U.S.C. § 1344. The five-year program establishes a schedule for potential lease sales, but it does not itself require those sales to occur or authorize any oil and gas activities. *See id.* Under the statute, the leasing program "considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS], and the potential impact of oil and gas

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                                    4

Case 3:25-cv-00038-SLG    Document 57-1    Filed 01/16/26    Page 12 of 42

exploration on other resource values of the [OCS] . . . ." *Id.* § 1344(a)(1). Similar

requirements apply to the remaining three steps. *See*, *e.g.*, *id.* §§ 1340(g)(3),

1351(h)(1)(D)(i). Leasing and later development of oil and gas resources on the OCS can

only occur pursuant to this program. *See*, *e.g.*, *id.* § 1344(d)(3). Even exploration, such

as seismic surveys, can only occur after the proponent of a survey obtains the relevant

federal permits or plan approvals, which are subject to environmental and other

procedural requirements. *See id.* § 1340; 30 C.F.R. pt. 551.

OCSLA also contains a provision allowing the President to reserve areas of the

OCS from disposition by leasing, including for oil and gas development. Specifically,

section 12(a) states, "The President of the United States may, from time to time,

withdraw from disposition any of the unleased lands of the outer Continental Shelf." 43

U.S.C. § 1341(a). The statute also provides that "[t]he United States reserves and retains

the right to designate by and through the Secretary of Defense, with the approval of the

President, as areas restricted from exploration and operation that part of the [OCS]

needed for national defense . . . ." *Id.* § 1341(d).

## II.     President Biden's Withdrawal of Areas of the OCS from Oil and Gas Leasing and President Trump's Rescission of Those Withdrawals

President Biden took multiple actions during his presidency to withdraw areas

from the OCS under section 12(a) of OCSLA. He withdrew an area in the Beaufort Sea

off the coast of Alaska by memorandum dated March 13, 2023. *See* Ex. 1. And on

January 6, 2025, he issued two memoranda withdrawing certain areas of the OCS from

potential oil and gas leasing. The first withdrew areas in the North Bering Sea off the

coast of Alaska. *See* Withdrawal of Certain Areas of the United States OCS from Oil or Natural Gas Leasing, 90 Fed. Reg. 6,739 (Jan. 6, 2025). The second withdrew areas off the East Coast, West Coast, and within the Gulf of America. *See* Withdrawal of Certain Areas of the United States OCS from Oil and Natural Gas Leasing, 90 Fed. Reg. 6,743 (Jan. 6, 2025).

Upon taking office, on January 20, 2025, President Trump issued an executive order rescinding President Biden's withdrawals. *See* Exec. Order No. 14148 § 2(ccc), (vvv), (www), Initial Rescissions of Harmful Executive Orders and Actions, 90 Fed. Reg. 8237, 8240 (Jan. 20, 2025) ("2025 Order"). Plaintiffs then filed suit challenging that rescission. *See* Sec. Am. Compl., Dkt. No. 37. They allege that the rescission violates the Constitution and is *ultra vires* because, in their view, section 12(a) of OCSLA allows a president to withdraw areas of the OCS, but not to modify or restore previously withdrawn areas. *See id.* ¶¶ 87-98. They ask the Court to invalidate the rescission and to enjoin the Secretary of the Interior and the Secretary of Commerce from enforcing it. *See id.* at 51-53 (Prayer for Relief).

Many of the same environmental groups were also involved in another case before this Court, which they initiated during President Trump's first term. In that case, the plaintiffs challenged an executive order by President Trump reversing an earlier withdrawal by President Obama. *See* Exec. Order No. 13795, Implementing an America-First Offshore Energy Strategy, 82 Fed. Reg. 20,815 (May 3, 2017) ("2017 Order"). On summary judgment, the court in that case concluded that President Trump lacked

*Northern Alaska Environmental Center v. Trump, et al.*      No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.      6

Case 3:25-cv-00038-SLG      Document 57-1      Filed 01/16/26      Page 14 of 42

authority under section 12(a) of OCSLA, 43 U.S.C. § 1340(a), to reverse President

Obama's withdrawal of areas on the OCS, and it vacated the relevant portion of the 2017

Order.  *See League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1030-31 (D.

Alaska 2019), *vacated as moot*, 843 F. Appx. 937 (9th Cir. 2021).[1]  On appeal, the

district court's order was vacated as moot following President Biden's issuance of an

executive order rescinding the 2017 Order.  *See* Exec. Order No. 13990, Protecting

Public Health and the Environment and Restoring Science to Tackle the Climate Crisis,

86 Fed. Reg. 7037 (Jan. 20, 2021).

      In addition to rescinding President Biden's withdrawals, President Trump's 2025

Order also rescinded Executive Order No. 13990 issued by President Biden, which had

reinstated the Obama withdrawals.  *See* Exec. Order No. 14148 §§ 2(f).  By rescinding

Executive Order No. 13990, the 2025 Order again restored the rescissions at issue in the

*League of Conservation Voters* case.  *See id.* § 2(f).  Plaintiffs in that case filed a Rule

60(b) motion asking the court to reinstate its prior summary judgment order, but the

Court denied that motion.  *See League of Conservation Voters v. Trump*, No. 3:17-cv-

101-SLG, 2025 WL 2403127 (D. Alaska Aug. 18, 2025) (Gleason, J.).  Plaintiffs have

now amended the complaint in this case to include challenges to the rescissions that were

at issue in *League of Conservation Voters*.  *See* Sec. Am. Compl. ¶¶ 82, 92.

---

[1] During the course of that litigation, the district court denied the government's motion to
dismiss the case on jurisdictional grounds.  *See League of Conservation Voters v. Trump*,
303 F. Supp. 3d 985 (D. Alaska 2018).

The January 6, 2025 withdrawals have been challenged in two lawsuits, one

brought by a coalition of states and industry groups in the Western District of Louisiana,

*see* Compl., *Louisiana v. Trump*, No. 2:25-cv-71 (W.D. La. Jan. 17, 2025), Dkt. No. 1,

and another brought by the State of Texas and an oil and gas production company in the

Eastern District of Texas, *see* Compl., *Texas v. Trump*, No. 9:25-cv-10 (E.D. Tex. Jan.

20, 2025), Dkt. No. 1.  On October 2, 2025, the *Louisiana* court ruled that President

Biden's withdrawals exceeded the President's authority under section 12(a) of OCSLA to

the extent they were intended to be permanent.  *See Louisiana v. Biden*, No. 2:25-CV-71,

2025 WL 2808502, at *6 (W.D. La. Oct. 2, 2025).  There is no merits ruling yet in the

*Texas* case.

## III.    BOEM's Five-Year Program

In December 2023, the Department of the Interior approved the current 2024-2029

National OCS Oil and Gas Leasing Program ("2024-2029 Program").[2]  The Program

includes three sales from 2025 to 2029 in the Western and Central Gulf.  *See id.* at 3-4.

None of the areas included in those sales are within areas that were withdrawn by

President Biden.  In addition, the areas in President Biden's January 6, 2025

Memorandum in the Eastern Gulf, South Atlantic and Straits of Florida Planning Areas,

and the North Carolina portion of the Mid-Atlantic Planning Area, 90 Fed. Reg. at 6,743-

45, remain withdrawn until June 30, 2032, pursuant to two memoranda issued by

---

[2] The 2024-2029 Five-Year Program is available at:
https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/2024-
2029_NationalOCSProgram_PFP_Sept_2023_Compliant.pdf (last visited Jan. 9, 2026).

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                              8

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 16 of 42

President Trump on September 8 and 25, 2020. *See* https://www.boem.gov/oil-gas-energy/leasing/areas-under-restriction (last visited May 27, 2025). Likewise, the North Aleutian Basin Planning Area, including Bristol Bay, remains withdrawn pursuant to a December 16, 2014 Memorandum issued by President Obama. *See id.* Other areas in the Atlantic and Pacific and off the Coast of Alaska identified in President Biden's January 6, 2025 Memoranda are no longer subject to withdrawal. *See* 90 Fed. Reg. at 6,741; 90 Fed. Reg. at 6,745.

In April 2025, BOEM announced that it would begin the planning process for a new 11th National OCS Oil and Gas Leasing Program, which may supplant the current one.[3] The Secretary's First Proposal includes 21 sales in the Alaska Region, 7 in the Gulf of America, and 6 in the Pacific Region.[4] Some of those proposed sales could occur in areas that were withdrawn by President Biden, but reopened for leasing by President Trump. But it will likely take over a year, for a new National OCS Program to be finalized and it is speculative at this time to predict what sales could be scheduled in the final approved Program.

## LEGAL STANDARD FOR A MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(1), a complaint, or any claims therein, may be dismissed for lack of subject matter jurisdiction. An attack on the court's jurisdiction

---

[3] *See* https://www.boem.gov/oil-gas-energy/national-program/national-ocs-oil-and-gas-leasing-program (last visited Jan. 9, 2026).

[4] *See* https://www.boem.gov/oil-gas-energy/national-program/details-secretarys-1st-proposal (last visited Jan. 9, 2026).

*Northern Alaska Environmental Center v. Trump, et al.*                    No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                    9

Case 3:25-cv-00038-SLG    Document 57-1    Filed 01/16/26    Page 17 of 42

may be made either as a facial challenge, in which case the usual pleading standard

applies, or as a factual challenge. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir.

2014).[5]  In response to a facial challenge, a plaintiff may rely on factual allegations,

which the court will accept "as true and drawing all reasonable inferences in the

plaintiff's favor." *Id.*  On the other hand, when considering a motion that challenges the

existence of jurisdiction in fact, no presumption of truthfulness attaches to the plaintiff's

allegations. *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir.

1979).  The Court "is not restricted to the face of the pleadings, but may review any

evidence, such as affidavits and testimony, to resolve factual disputes concerning the

existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

"When the defendant raises a factual attack, the plaintiff must support her jurisdictional

allegations with 'competent proof,' under the same evidentiary standard that governs in

the summary judgment context." *Liete*, 749 F.3d at 1121 (citations omitted); *see also*

*Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 944 (9th Cir. 2021).  "The

plaintiff bears the burden of proving by a preponderance of the evidence that each of the

requirements for subject-matter jurisdiction has been met." *Liete*, 749 F.3d at 1121.

---

[5] Defendants' motion is brought both as a factual and facial challenge.  To the extent the
Defendants' challenge Plaintiffs' assertions of imminent harm with factual information in
the standing and ripeness arguments in sections I and II of the Argument section, it is a
factual challenge.  Otherwise, it is a facial challenge.

*Northern Alaska Environmental Center v. Trump, et al.*　　　　　　No. 3:25-cv-00038-SLG
Defs.' Mem. in Supp. of Motion to Dismiss Sec. Am. Compl.　　　　　　10

Case 3:25-cv-00038-SLG　　　Document 57-1　　　Filed 01/16/26　　　Page 18 of 42

# ARGUMENT

## I. Plaintiffs Lack Standing and Their Claims Are Not Ripe

Plaintiffs have failed to demonstrate any imminent harm to their interests caused by President Trump's rescission of the OCS withdrawals. Therefore, they lack standing, and their claims are not ripe.

### A. Plaintiffs Have Failed to Demonstrate Standing

Plaintiffs bear the burden of demonstrating that they have standing under Article III of the Constitution. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see also Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 (2024). In order to establish standing, Plaintiffs must show that: (1) they have "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "that the injury was likely caused by the defendant;" and (3) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The Supreme Court has emphasized that an injury must be "'*certainly* impending' to constitute injury in fact"—"'[a]llegations of *possible* future injury' are not sufficient.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Plaintiffs have failed to demonstrate sufficient injuries to establish standing. First, Plaintiffs have failed to show that their members will suffer a concrete and particularized

*Northern Alaska Environmental Center v. Trump, et al.*      No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.      11

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 19 of 42

harm to their interests in the environment.[6]  Instead, they offer only vague allegations as

to how such interests may be affected.  They generally allege that Plaintiffs' members

"use and enjoy the Chukchi and Beaufort Seas, Atlantic Ocean including near deepwater

canyons, Pacific Ocean, Eastern and Central Gulf of [America], and coastal regions

adjacent to those areas, for cultural and subsistence purposes, recreation, wildlife

viewing, education, research, photography, aesthetic and spiritual enjoyment, or their

professions or livelihoods, and they enjoy wildlife that utilizes these areas."[7]  Sec. Am.

Compl. ¶ 20.  And they allege that any "oil and gas exploration or development,

including seismic surveying" that would cause environmental harm in those areas would

affect their interests.  *Id.*  As to their plans to use these areas in the future, they allege that

their members "regularly use, enjoy, and benefit from the marine and coastal

environments of the Chukchi and Beaufort Seas, Atlantic Ocean, Pacific Ocean, and

Eastern Gulf of [America] and plan to continue doing so in the future."  *Id.* ¶ 21.  These

allegations are far too general to establish standing.

> To establish the harm element of standing, Plaintiffs must do more than allege that

---

[6] Organizations, such as the Plaintiffs, may establish standing based on harms to their members.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  In order to establish standing in this fashion, Plaintiffs must show that their members would have standing to sue in their own right, the issues at stake are relevant to the purposes of the organizations, and the claims do not require the participation of the individual members.  *See id.*

[7] The Complaint contains no allegations that Plaintiffs' members have used, or planned to use, the Northern Bering Sea Climate Resilience Area withdrawn by President Biden.  *See* Sec. Am. Compl. ¶¶ 20-21; *see also* 90 Fed. Reg. at 6,739-41.

they generally recreate in certain areas; they must instead provide evidence of concrete

plans to visit areas where they allege environmental harm will occur. *Summers*, 555 U.S.

at 496. In *Summers*, environmental groups challenged U.S. Forest Service regulations

governing fire management. *Id.* at 490. After the groups' challenge to one application of

the regulations was resolved, they attempted to maintain their challenge to the regulations

as a whole. *Id.* at 491-92. In an attempt to salvage standing, the groups offered an

affidavit from one of their members asserting that he had "visited many national forests

and plan[ned] to visit several unnamed national forests in the future." *Id.* at 495. The

Court noted that "[t]he national forests occupy more than 190 million acres" and

concluded that there was "hardly a likelihood" that the declarant would encounter a

project governed by the regulations. *Id.*

   The Court found that such general assertions were not enough to confer standing.

*Id.* at 496 (accepting such allegations as sufficient "would be tantamount to eliminating

the requirement of concrete, particularized injury in fact"); *see also Wilderness Soc'y v.

Rey*, 622 F.3d 1251, 1257 (9th Cir. 2010) (general interest in protecting forest lands was

insufficient to establish standing); *Kunaknana v. U.S. Army Corp. of Eng'rs*, 23 F. Supp.

3d 1063, 1084 (D. Alaska 2014) ("[B]oth *Lujan* and *Wilderness Society* make clear that

an environmental plaintiff cannot base standing on a connection to the broader ecosystem

within which a project takes place."). Likewise, in this case, Plaintiffs' allegations that

*Northern Alaska Environmental Center v. Trump, et al.*                    No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                                    13

Case 3:25-cv-00038-SLG    Document 57-1    Filed 01/16/26    Page 21 of 42

their members plan to use and enjoy some area within the over 625 million acres[8] of OCS withdrawn by President Biden are too general to establish standing.

Moreover, as the Court explained in *Summers*, even plans to visit a more specific area at some point in the future are likewise not sufficient to establish standing. *See* 555 U.S. at 496 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.") (quoting *Lujan*, 504 U.S. at 564); *see also Wilderness Society*, 622 F.3d at 1257 (finding standing allegations to be insufficient where there was "no indication that the [challenged project] would affect the particular area of the [forest] that [the declarant] plan[ned] to use in the future"). The same is true here—Plaintiffs have failed to assert concrete plans to visit a particular area that will be threatened by the rescission of the withdrawals, and therefore their allegations are insufficient to establish standing.

Second, even assuming that Plaintiffs could establish harm to a concrete and particularized interest of theirs in the environment, they still have not shown that any such injury is imminent. It is a "settled requirement" of standing that the injury complained of must be "at least *imminent*." *Lujan*, 504 U.S. at 564 n.2. This requirement

---

[8] The 2025 withdrawals encompassed more than 625 million acres. *See* https://www.doi.gov/pressreleases/president-biden-takes-action-protect-americas-coastlines-future-oil-and-gas-leasing (last visited May 27, 2025). The 2023 withdrawal was approximately 2.8 million acres. *See* https://www.doi.gov/pressreleases/biden-harris-administration-announces-sweeping-protections-16-million-acres-land-and (last visited May 27, 2025).

*Northern Alaska Environmental Center v. Trump, et al.*                     No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                                    14

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 22 of 42

is designed to ensure that the claim of standing "is not 'an ingenious academic exercise in the conceivable,'" but rather an imminent concrete harm. *Id.* at 566 (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688 (1973)); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (The injury "must be concrete in both a qualitative and temporal sense," and the plaintiff "must allege an injury to himself that is 'distinct and palpable.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))). "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore*, 495 U.S. at 158 (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979)).

Here, Plaintiffs' alleged injuries are insufficiently imminent to establish standing. For starters, even without President Biden's withdrawals, much of the area subject to those withdrawals remains withdrawn pursuant to earlier actions by President Trump. The area of the Eastern Gulf, South Atlantic and Straits of Florida Planning Areas, and the North Carolina portion of the Mid-Atlantic Planning Area will remain withdrawn through June 2032 due to President Trump's September 8, 2020, and September 25, 2020, Memoranda. *See* https://www.boem.gov/oil-gas-energy/leasing/areas-under-restriction (last visited Jan. 9, 2026). Therefore, there is no change in status to those areas following President Trump's rescission of President Biden's withdrawals. To be sure, some areas in the Mid-Atlantic, North Atlantic, and the Pacific are no longer withdrawn due to President Trump's 2025 Order. *See* Jan. 6, 2025 Memo., 90 Fed. Reg.

*Northern Alaska Environmental Center v. Trump, et al.*      No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.      15

Case 3:25-cv-00038-SLG    Document 57-1    Filed 01/16/26    Page 23 of 42

at 6745.  But Plaintiffs' Complaint contains no allegations of any future oil and gas

activity in these areas, let alone any imminent activity, that would affect their interests.[9]

As to the areas of the Arctic that were withdrawn by President Biden, *see* Jan. 6,

2025 Memo., 90 Fed. Reg. 6741; March 13, 2023 Memo., Plaintiffs' Complaint generally

describes the environment in those areas, prior oil and gas activity, and potential future

activity.[10]  *See* Sec. Am. Compl. ¶¶ 33, 40, 46-49.  But Plaintiffs have not identified any

actual activities, or even activities proposed and pending approval, that may cause them

harm.  Plaintiffs allege that seismic surveys for oil and gas exploration may occur as a

result of the reopening of some of these areas of the OCS, which may cause harm to fish

and marine mammals.  *See id.* ¶¶ 44-48.  But they do not identify any actual plans or

permit applications to conduct seismic activities in those areas.  Any such activities

would require approval by the Department of the Interior.  *See* 43 U.S.C. § 1340; 30

C.F.R. pt. 551.  Although there may be some recent survey activity in areas under Alaska

state jurisdiction, BOEM has approved no geological and geophysical exploration

activities, including seismic surveys, in the areas withdrawn by President Biden, and no

---

[9] The Complaint contains allegations about the environment in the Gulf, Pacific, and Atlantic and the general impacts of oil and gas leasing, *see* Sec. Am. Compl. ¶¶ 34-39, 41-45, but it contains no allegations about specific future oil and gas activities.

[10] Plaintiffs suggest that there is interest in future leasing in the nearshore Beaufort Sea area.  *See* Sec. Am. Compl. ¶¶ 48-49.  When BOEM last issued a call for information and nominations in that area in March 2018, it received one response from industry, and it did not proceed with a sale in that area.  *See* Second Decl. of Dr. Megan Carr ¶ 4.  There is some ongoing production in that area, but that production is limited to three leases, which are unaffected by President Biden's withdrawal of the area or President Trump's restoration of the area.  *Id.*

*Northern Alaska Environmental Center v. Trump, et al.*                    No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                                    16

applications for such activities are pending. *See* Second Carr Decl. ¶¶ 2-3; 90 Fed. Reg. 40,568 (Aug. 20, 2025).

Finally, even for those areas no longer subject to any other prior withdrawal—i.e., the Mid-Atlantic, North Atlantic, Pacific, and Arctic—any actual oil and gas development is likely at least a couple of years away because they are not part of BOEM's 2024-2029 National OCS Program. *See* Background, *supra.* While it is true that the administration has announced a draft proposed Program that could potentially offer some of the previously withdrawn areas in future sales, no Program has yet been approved. Unless and until any of those areas are included in a new program, offered for lease in a lease sale, and leases are sold and issued, any asserted injuries from oil and gas development in those areas is wholly speculative and therefore insufficient to establish standing. *Whitmore*, 495 U.S. at 158 ("Allegations of possible future injury do not satisfy the requirements of Art. III.").

Accordingly, because Plaintiffs have failed to demonstrate any imminent harm to their concrete and particularized interests in the environment, they lack standing.

### B. Plaintiffs' Claims Are Not Ripe

For similar reasons, Plaintiffs' claims are not ripe—they have not identified any action by Defendants that harms their interests. "The 'ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1193 (9th Cir. 2011) (quoting *Nat'l Park Hospitality Ass'n v. Dept. of the Interior,* 538 U.S. 803, 808

(2003)). The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).

A case is not "'ripe' for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Nat'l Wildlife Fed'n*, 497 U.S. at 891; *see also Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. To determine whether a claim is ripe for review, a court should consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

This case is not ripe because, as discussed above, Plaintiffs' have not identified any harms to their interests in the environment that may occur before the Department of the Interior takes further steps to authorize oil and gas exploration or development. Therefore, delaying judicial review until Interior takes such steps and development is imminent would cause no hardship to Plaintiffs.

Significantly, Interior manages energy development activities on the OCS through

*Northern Alaska Environmental Center v. Trump, et al.*　　　　No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.　　　　18

Case 3:25-cv-00038-SLG　　　Document 57-1　　　Filed 01/16/26　　　Page 26 of 42

the four-stage process established in the 1978 amendments to OCSLA: (1) preparation of a five-year program of proposed lease sales; (2) lease sales; (3) exploration; and (4) development and production. 43 U.S.C. §§ 1344, 1337(a), 1340, 1351. The four stages are "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent." *California v. Watt*, 668 F.2d 1290, 1297 (D.C. Cir. 1981). Each stage involves a regulatory review "that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities." *Secretary of Interior v. California*, 464 U.S. 312, 337 (1984).

Congress designed this four-stage framework precisely to "forestall *premature* litigation regarding adverse environmental effects that all agree will flow, if at all, only from the latter stages of OCS exploration and production." *Id*. at 341 (emphasis added); *accord North Slope Borough v. Andrus*, 642 F.2d 589, 595 (D.C. Cir. 1980) ("In fact, a purpose of OCSLA is to permit an expedient resolution of preliminary matters in the development of oil lands while preserving administrative and judicial review *for future times* when potential threats to the environment are readily visualized and evaluated." (emphasis added)).

Consistent with reasoning in *North Slope Borough*, the D.C. Circuit rejected as unripe certain claims under the National Environmental Policy Act and the Endangered Species Act challenging Interior's five-year leasing program for 2007-2012 – i.e., the first of the four stages in OCSLA's regulatory process. *See Center for Biological Diversity v. U.S. Department of Interior*, 563 F.3d 466, 480–81 (D.C. Cir. 2009). The

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
Defs.' Mem. in Supp. of Motion to Dismiss Sec. Am. Compl.                          19

Case 3:25-cv-00038-SLG   Document 57-1   Filed 01/16/26   Page 27 of 42

court reasoned that before Interior authorized leasing at the second stage of the OCSLA process, "no harm will yet have occurred to the animals or their environment." *Id*. at 481. The court rejected the petitioners' claim that the five-year program would lead to additional seismic surveying, reasoning that the program *itself* did not authorize this surveying, and the surveying required a separate permit from Interior. *Id*. at 481 n.1. Likewise here, the rescission of President Biden's withdrawals authorizes no seismic surveying, and any claims challenging it on that basis are not ripe.

The Ninth Circuit has also repeatedly recognized that even Interior's decisions regarding individual lease sales (the second stage in OCSLA's regulatory process) have no actual effects on the Outer Continental Shelf. *See Village of False Pass v. Clark*, 733 F.2d 605, 611 (9th Cir. 1984) ("The lease sale decision itself could not directly place gray or right whales in jeopardy, and the plan insures that the many agency actions that may follow indirectly from the sale will not either."); *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1194 (9th Cir. 1988) (noting that the risks to endangered species "during the lease sale stage are virtually nonexistent"); *accord California*, 464 U.S. at 340 ("Since 1978, the purchase of an OCS lease, standing alone, entails no right to explore, develop or produce oil and gas resources on the OCS.").

At this juncture, Interior has not yet approved a five-year program incorporating the previously withdrawn areas for *potential* leasing. Before any of these areas can be leased, several more steps must occur: BOEM will issue a Proposed Program, BOEM will issue a Proposed Final Program, Congress and the President will have 60 days to

*Northern Alaska Environmental Center v. Trump, et al.*     No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.     20

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 28 of 42

review the Proposed Final Program, and then the Secretary of the Interior will issue a

final approval of the Program. *See* 43 U.S.C. § 1344(c), (d); *see also* 30 C.F.R. pt. 556,

subpt. B. Given that none of the previously withdrawn areas are available, or will

imminently be available, to be offered for lease, Plaintiffs can identify no harm to their

interests, and proceeding to the merits of their claim would be contrary to the statutory

framework established by Congress and circuit precedent. Therefore, Plaintiffs' claims

are not ripe.

## II. Plaintiffs' Claims Against the President Fail for Lack of a Waiver of Sovereign Immunity and Right of Action

Plaintiffs have failed to identify an applicable waiver of sovereign immunity or

right of action that would allow them to bring suit against the President. The Court may

dismiss on this basis without reaching either standing or ripeness. *Al-Haramain Islamic*

*Foundation, Inc. v. Obama*, 705 F.3d 845, 850 n.2 (9th Cir. 2012).

### A. Plaintiffs' Claims Are Barred by Sovereign Immunity

The United States is immune from suit except to the extent Congress

unequivocally and expressly waives that immunity. *Lane v. Pena*, 518 U.S. 187, 192

(1996); *FDIC v. Meyer*, 510 U.S. 471 (1994). A party asserting a claim against the

United States bears "the burden of establishing that its action falls within an

unequivocally expressed waiver of sovereign immunity by Congress." *Dunn v. Black,*

*P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007). Any such waiver, moreover,

must be strictly construed, and accompanying limitations on the court's jurisdiction must

be strictly enforced. *See United States v. Mottaz*, 476 U.S. 834, 841 (1986); *United*

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.          21

Case 3:25-cv-00038-SLG   Document 57-1   Filed 01/16/26   Page 29 of 42

*States v. Testan*, 424 U.S. 392, 399 (1976). "When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." *Consejo de Desarollo Economico De Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007) (citation omitted).

Generally, in claims against the federal government, the APA supplies the necessary waiver of sovereign immunity. *See Gallo Cattle Co. v. U.S. Dept. of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998); 5 U.S.C. § 702. This waiver of sovereign immunity, however, does not apply to challenges to actions by the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA."). Thus, the APA does not supply the necessary waiver of sovereign immunity as to the claims challenging actions of the President.

Nor does OCSLA contain the requisite waiver of sovereign immunity. OCSLA contains a citizen suit provision for claims challenging certain actions taken pursuant to the statute. 43 U.S.C. § 1349(a). That citizen suit provision, however, does not provide for actions challenging decisions by a President regarding the withdrawal of areas of the OCS from oil and gas leasing. *See id.* § 1349(b)-(c). Moreover, the history of OCSLA further demonstrates that Congress did not intend to waive sovereign immunity for such suits. When Congress enacted OCSLA in 1953, it did not provide that presidential withdrawal decisions would be subject to judicial review. Pub. L. No. 212, Ch. 345

*Northern Alaska Environmental Center v. Trump, et al.*      No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.      22

Case 3:25-cv-00038-SLG      Document 57-1      Filed 01/16/26      Page 30 of 42

§ 4(b), 67 Stat. 462, 463 (Aug. 7, 1953).  In 1976, Congress amended Section 702 of the APA to waive sovereign immunity for non-monetary relief, *see* 5 U.S.C. § 702, but that waiver does not apply to the President.  *See Franklin*, 505 U.S. at 801.  Two years later, Congress amended OCSLA to include the extensive judicial review provision that remains largely the same today.  Pub. L. No. 95-372, § 208, 92 Stat. 629, 657-59 (1978) (adding 43 U.S.C. § 1349).  Yet Congress once again chose not to waive sovereign immunity for the President's withdrawal decisions.  Where Congress has waived immunity, courts must respect the scope of that waiver.  *Al-Haramain*, 705 F.3d at 850–52.

Further, the exceptions to sovereign immunity set forth in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949), are inapplicable here.  *Larson* identifies two exceptions to sovereign immunity for actions taken by government officers.  The first applies "where the officer's powers are limited by statute" and he acts "beyond those limitations."  *Id.*  In other words, "[t]he officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden."  *Id.*  Such actions are considered to be *ultra vires* and "therefore may be made the object of specific relief."  *Id.*  The second exception applies when an officer "take[s] action in the sovereign's name [that] is claimed to be unconstitutional."  *Id.* at 690.  The Supreme Court has labeled *Larson* a "narrow and questionable exception" — an exception that the Court has applied rarely (and not since 1963 in the context of federal sovereign immunity) and has never endorsed as a proper

vehicle for review of presidential action. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 116 (1984); *see also E.V. v. Robinson*, 906 F.3d 1082, 1091 n.9 (9th Cir. 2018). Even if the 1976 amendments to the APA did not abrogate the *Larson* exceptions, neither claim in this case fits within those exceptions.[11]

First, the *Larson* exception for *ultra vires* actions by an officer in excess of statutory authority does not apply. *See* 337 U.S. at 689–90. As an initial matter, it is questionable whether this exception can be applied to the President, as opposed to a subordinate officer. In *Dalton v. Specter*, 511 U.S. 462, 474 (1994), the Supreme Court assumed for the sake of argument that a claim that the President had exceeded his authority under Defense Base Closure and Realignment Act of 1990 was reviewable outside of the APA framework. But the Court went on to rule that the claim could not proceed in any event based on "longstanding authority . . . that [judicial] review is not available when the statute in question commits the decision to the discretion of the President." *Id.* As the Court explained, "where a claim 'concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power.'"

---

[11] Although this Court recently held otherwise, *Robinson*, 906 F.3d at 1092, the United States' position is that the 1976 amendments to APA Section 702 abrogated the *Larson* exceptions. *Robinson*'s holding departs from Supreme Court precedent on sovereign immunity, and *Robinson* did not address whether *Larson* should apply to claims against the President. Finally, OCSLA represents a "precisely drawn, detailed statute" that under *Block v. North Dakota*, 461 U.S. 273, 275 n.1, 284–85 (1983), overrides the general remedy afforded by the *Larson* exceptions.

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.          24

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 32 of 42

*Id.* (quoting *Dakota Central Tele. Co. v. S. Dakota ex rel Payne*, 250 U.S. 163, 184 (1919); *see also Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112-14 (1948) (holding that the President's decision to approve or deny decisions by the Civil Aeronautics Board were not reviewable because they embodied presidential discretion beyond the purview of the courts). Therefore, the first *Larsen* exception for *ultra vires* action should not be applied to claims directed at the President.

Even if the first *ultra vires* exception could theoretically be applied against a president, however, it would still be inapplicable under the facts of this case. The exception only applies when "an employee of the United States acts completely outside his governmental authority." *United States v. Yakima Tribal Court*, 806 F.2d 853, 860 (9th Cir. 1986). As an example, "if a dispute occurs pertaining to the sale of an employee's personal house, his government employment provides him with no shield to liability." *Id.* But "[a] simple mistake of fact or law does not necessarily mean that an officer of the government has exceeded the scope of his authority." *Id.* at 860. And, "unlike constitutional violations, there is no per se divestiture of sovereign immunity when statutes or regulations are violated while an agent is pursuing his authorized duties." *Id.* Instead, the officer must act "completely outside his governmental authority" to lose immunity. *Id*. at 859.

No such action wholly outside of the President's statutory authority is alleged to have occurred. Section 12(a) of OCSLA authorizes the President, in his discretion, to make withdrawal decisions "from time to time." 43 U.S.C. § 1341(a). The statute places

no limitations on the President's ability to make such decisions. *Id.* President Trump exercised that authority by rescinding the prior withdrawals. *See* 90 Fed. Reg. at 8,237 (rescinding prior actions "[b]y the authority vested in me as President by the Constitution and the laws of the United States of America . . .").  Regardless of whether the President exercised that authority correctly, the President acted pursuant to congressional authorization in a statute and, therefore, not "completely outside his governmental authority." *Yakima Tribal Court*, 806 F.2d at 859; *see also Larson*, 337 U.S. at 695 (holding that an "incorrect decision as to law or fact" does not result in a waiver of sovereign immunity); *Aminoil U.S.A., Inc. v. California Water Resources Board*, 674 F.2d 1227, 1233–34 (9th Cir. 1982) (rejecting application of *Larson* exception based on argument that Administrator of the Environmental Protection Agency had incorrectly determined that company's property was subject to federal jurisdiction).  Because the President's decision did not "conflict with the terms of his valid statutory authority," it remains the action of the sovereign and thus "cannot be enjoined." *Larson*, 337 U.S. at 695.[12]

The second *Larson* exception for unconstitutional acts by an officer also does not

---

[12] In *Louisiana*, the Court rejected the federal defendants' argument that the plaintiffs lacked a waiver of sovereign immunity to challenge the withdrawal action taken by the President, relying on the *ultra vires* exception in *Larson*.  *Louisiana*, 2025 WL 2808502, at *4.  That ruling is not binding on this Court.  Moreover, the basis of the claims in that case was that President Biden's *exceeded* his authority under OCSLA by attempting to withdraw areas of the OCS permanently.  *See id.* at 14-15.  Plaintiffs have no similar claim in this case.

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.          26

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 34 of 42

apply. *Franklin* recognized that courts may review the President's actions for constitutionality. 505 U.S. at 801. But "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review under the exception recognized in *Franklin*." *Dalton*, 511 U.S. at 473-74; *see also id.* at 471 (rejecting the principle that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine"); *see also Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023) ("Our resolution should not be read to empower future objectors to frame any unpopular presidential action as '*ultra vires*' and thus open the floodgates to frivolous judicial challenges that hinder the President's power to respond to pressing issues.").

The reasoning of *Dalton* applies here—Plaintiffs' Complaint demonstrates that its constitutional claim is not separable from its claim that the President exceeded his authority under OCSLA. The constitutional claim (First Claim) alleges that the President had no authority under the Property Clause to rescind the withdrawal. Sec. Am. Compl. ¶ 89. But, as Plaintiffs recognize, their constitutional claim could only prevail if the President in fact lacks the relevant authority under OCSLA. Thus, in pleading the constitutional claim, they assert, "OCSLA Section 12(a), 43 U.S.C. 1341(a), authorizes the President to withdraw unleased lands of the [OCS] from disposition. It does not authorize the President to re-open withdrawn areas to disposition." Sec. Am. Compl. ¶ 90. They further allege that "[t]here is no other source of authority that permits the President to reverse or undo a Section 12(a) withdrawal" and "[i]n reversing President

*Northern Alaska Environmental Center v. Trump, et al.*                    No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                    27

Case 3:25-cv-00038-SLG    Document 57-1    Filed 01/16/26    Page 35 of 42

Biden's Section 12(a) withdrawals," President Trump exceeded his authority under Article II of the U.S. Constitution. *Id.* ¶¶ 91-92. In other words, the constitutional claim is inextricably intertwined with Plaintiffs' claim that President Trump exceeded his authority under section 12(a) of OCSLA and therefore should not be treated as a separate claim. *See Dalton*, 511 U.S. at 473.

## B. Plaintiffs Have No Right of Action

In addition to the requirement of an applicable waiver of sovereign immunity, a plaintiff may only bring suit to enforce federal law if Congress has provided a private right of action. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Such a right is created only when "Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights." *Ball v. Rodgers*, 492 F.3d 1094, 1104 (9th Cir. 2007) (citation and internal quotation marks omitted). Without a specific grant of a right of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Lonberg v. City of Riverside*, 571 F.3d 846, 850 (9th Cir. 2009) (quoting *Sandoval*, 532 U.S. at 286-87.

Here, no statute provides the requisite right of action for Plaintiffs' claim that the President exceeded his authority under OCSLA. Such a right of action cannot be found in OCSLA because, although OCSLA contains a citizen's suit provision allowing litigants to challenge certain actions taken pursuant to the statute, *see* 43 U.S.C. § 1349, those do not include withdrawal decisions by the President under 43 U.S.C. § 1341(a).

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                              28

Case 3:25-cv-00038-SLG    Document 57-1    Filed 01/16/26    Page 36 of 42

Nor is any relevant right of action conferred by the APA. Although the APA generally provides a right of action against federal officials for statutory violations, *see* 5 U.S.C. § 702, the APA does not apply to the President. *See Franklin*, 505 U.S. 800-01. Thus, there is no statute that provides the requisite right of action.

Nor does *Larson* provide a right of action. *Larson* itself recognized the distinction between the separate requirements for a waiver of sovereign immunity and private right of action. The Supreme Court emphasized that, even if sovereign immunity posed no barrier to specific relief against an officer, the plaintiff still must have a cause of action to pursue this relief. *Larson*, 337 U.S. at 692–93 (recognizing that it is a "prerequisite to the maintenance of any action for specific relief that the plaintiff claim an invasion of his legal rights, either past or threatened"). Without a cause of action, the plaintiff's suit "must fail even if he alleges that the agent acted beyond statutory authority or unconstitutionally." *Id*. at 693. Thus, even if sovereign immunity is waived for Plaintiffs' *ultra vires* challenge under section 12(a) of OCSLA—which Defendants dispute—Plaintiffs still have no right of action, and therefore the claim is not justiciable. *See Sandoval*, 532 U.S. at 286-87.

Plaintiffs also lack a private right of action for their purported constitutional claim alleging a violation of the Property Clause. A right of action does not exist for every alleged violation of the Constitution. *See*, *e.g.*, *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018) ("Although there have been a few notable exceptions, the federal courts . . . have been hesitant to find causes of action arising directly from the

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.          29

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 37 of 42

Constitution."), *cert. denied*, 139 S. Ct. 1200 (2019).  Instead, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity . . . ."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).  Such a right of action is "a judge-made remedy" and does not exist for every alleged constitutional violation.  *See id.* (holding that the Supremacy Clause contains no implied right of action).

For certain constitutional violations, the Supreme Court has inferred an implied right of action, but only in instances where individual rights were being infringed.  The Court has, for example, found an implied right of action to protect a fired employee's Fifth Amendment right to due process.  *See Davis v. Passman*, 442 U.S. 228, 243-44 (1979); *see also Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 489-91 (2010) (an accounting firm that was investigated by an oversight board under Sarbanes-Oxley was entitled to challenge the constitutionality of the creation of the board); *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 642-43 (2002) (a telecommunications company was permitted to challenge a state commission's order on the basis that it was preempted by federal law).  A court, however, should not infer an implied equitable cause of action where the plaintiffs "are not subject to or threatened with any enforcement proceeding."  *See Douglas v. Independent Living Center of Southern California, Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting).

Here, there is no implied equitable cause of action for Plaintiffs' Property Clause claim.  This is not an instance where the government has directly infringed on a

*Northern Alaska Environmental Center v. Trump, et al.*
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.

No. 3:25-cv-00038-SLG
30

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 38 of 42

plaintiff's personal property or liberty interests.  *See Armstrong*, 575 U.S. at 327 ("What

our cases demonstrate is that, in a proper case, relief may be given in a court of equity . . .

to prevent an injurious act by a public officer.") (quotation marks and citation omitted).

Instead, Plaintiffs would ask the Court to create a new implied right of action for Property

Clause violations—an implied right that would presumably allow them to challenge any

action by the President.  There is no precedent for such an implied right, and the Court

should not find one.

## III.   Plaintiffs' Claims Against the Secretary of the Interior and Secretary of Commerce Fail for Lack of Final Agency Action

The claims against the Secretary of the Interior and the Secretary of Commerce

should be dismissed for lack of final agency action.  Generally, a plaintiff may challenge

actions by federal agencies and officials (but not the President), under the APA, 5 U.S.C.

§§ 701-06.  The APA provides a right of action for such suits.  *See* 5 U.S.C. § 702; *Gros

Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir. 2006).  But the APA's private

right of action is subject to important limitations, including the requirement that Plaintiffs

challenge final agency action.  *See* 5 U.S.C. § 704 ("Agency action made reviewable by

statute and final agency action for which there is no other adequate remedy in a court are

subject to judicial review."); *San Francisco Herring Ass'n v. Dept. of the Interior*, 946

F.3d 564, 575-76 (9th Cir. 2019).  Plaintiffs have identified no final agency actions by the

agency heads that can be reviewed under the APA.[13]

---

[13] Even aside from the infirmities discussed above, Plaintiffs cannot bring suit against the

*Northern Alaska Environmental Center v. Trump, et al.*       No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.                        31

Case 3:25-cv-00038-SLG     Document 57-1     Filed 01/16/26     Page 39 of 42

Agency action is "final" if (1) it "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). In determining whether an action is a final agency action, courts should consider "both the 'practical and legal effects of the agency action.'" *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1163 (9th Cir. 2018) (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006)). A court should also consider whether the agency has issued a decision or other document that "has the status of law or comparable legal force." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1095 (9th Cir. 2014) (citation omitted).

No final agency actions by the Secretary of the Interior or the Secretary of Commerce are challenged in this case. Plaintiffs allege that the Secretary of the Interior has issued an order announcing the President's withdrawal (Order No. 3420) and issued other orders directing agencies to implement other executive orders (Orders No. 3417 and 3418). *See* Sec. Am. Compl. ¶¶ 83-85. These are not final agency actions. Order No. 3420 merely restates what the President already accomplished by rescinding the withdrawals. *See* Order No. 3420 § 1 ("[T]his Order announces that President Trump has revoked the withdrawals of the OCS from oil and gas leasing that the Biden

---

agency heads under an *ultra vires* theory. When the waiver of sovereign immunity in section 702 of the APA applies, as it does to the agency heads, a plaintiff must proceed under the APA. *Robinson*, 906 F.3d at 1094 ("[T]he *Larson* framework does not apply where the waiver of sovereign immunity under section 702 does . . . .").

administration issued . . . ."), Ex. 2.  Although the Order directs Interior offices and bureaus "to take all actions available to expedite oil and gas leasing on the OCS," *id.*, Plaintiffs have not identified any specific implementing actions in their Complaint. Because the Order is not the consummation of the *agency's* decision-making process, and itself has no legal effect separate from the President's action to rescind the withdrawal, it is not a final agency action.  *See Columbia Riverkeeper*, 761 F.3d at 1095-96.

The other Interior Orders likewise do not take any final agency actions.  Order No. 3417 announces the President's declaration of a national energy emergency in Executive Order No. 14156 and directs Interior bureaus and offices to "identify the emergency authorities available to them" and take action to authorize "appropriate infrastructure, energy, environmental, and natural resources projects."  Order No. 3417 §§ 1, 4, Ex. 3. But it does not authorize any particular projects to move forward—the agency will make such decisions separately.  Order No. 3418 implements the President's Executive Order No. 14154, Unleashing American Energy, and instructs Interior to take steps to implement it.  *See* Order No. 3418 § 1, Ex. 4.  It instructs agency staff to review previously issued rules and plans for compliance with the executive order, but it does not itself rescind or suspend any such plans or rules.  *See id.* § 4.  Accordingly, these Orders are not final agency actions.  *See Whitewater Draw Natural Res. Cons. Dist. v. Mayorkas*, 5 F.4th 997, 1007-10 (9th Cir. 2021) (finding that a manual instructing an agency on how to comply with NEPA was not a final agency action).

Finally, Plaintiffs identify no actions taken by the Secretary of Commerce

implementing President Trump's rescission of the withdrawals.  Therefore, the claims against the Secretary must be dismissed for lack of final agency action.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed for lack of jurisdiction.

Respectfully submitted this 16th day of January 2026.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

*/s/ Luther L. Hajek*
LUTHER L. HAJEK (CO Bar # 44303)
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
999 18th Street, North Terrace, Suite 600
Denver, CO 80202
Tel: (303) 241-0826 / Fax: (303) 844-1350
luke.hajek@usdoj.gov

*Counsel for Defendants*

*Northern Alaska Environmental Center v. Trump, et al.*          No. 3:25-cv-00038-SLG
DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS SEC. AM. COMPL.          34

Case 3:25-cv-00038-SLG    Document 57-1    Filed 01/16/26    Page 42 of 42