Erik Grafe (AK Bar #0804010)
Hannah Payne Foster (AK Bar #2105045)
Earthjustice
310 K Street, Suite 508
Anchorage, AK 99501
T: (907) 277-2500
egrafe@earthjustice.org
hfoster@earthjustice.org
[*Additional counsel listed on signature page*]

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, et al.,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>       *Defendants*,<br>  and<br><br>AMERICAN PETROLEUM INSTITUTE, et al.,<br><br>       *Intervenor-Defendants*. | Case No. 3:25-cv-00038-SLG<br><br><br>**PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS FOR LACK OF JURISDICTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iv

INTRODUCTION .................................................................................................1

LEGAL BACKGROUND ......................................................................................2

FACTUAL AND PROCEDURAL BACKGROUND ..............................................4

I.  President Obama's Withdrawals and *League of Conservation Voters v. Trump* .......................................................................................5

II.  President Biden's Withdrawals ................................................................7

III.  President Trump's Latest Attempt to Reverse Withdrawals and Expedite Oil and Gas Development in the OCS ...................................7

STANDARD OF REVIEW .................................................................................10

ARGUMENT ......................................................................................................12

I.  Plaintiffs Have Standing to Bring this Action....................................13

    A.  Legal Standard ................................................................................13

    B.  Plaintiffs' Allegations Demonstrate a Concrete and Particularized Injury....................................................................14

    C.  Harm Is Imminent Now that the Withdrawn OCS Areas Are Available and Being Considered for Oil and Gas Exploration and Development ................................................18

        1.  Defendants have taken numerous actions to expedite OCS oil and gas exploration and development................................................................20

        2.  Industry has expressed significant interest in OCS exploration and development activities..........................21

        3.  Seismic surveys and their resulting impacts can now occur in reopened OCS areas...................................21

        4.  Past practice shows that harm is imminent....................22

5.    Imminence does not require exploration and development activities to be already occurring..............23

D.    The Causation Standard is Met Because the Oil and Gas Industry is Likely to Explore and Develop Reopened OCS Areas....................................................................................24

II.    Plaintiffs' Legal Claims Are Ripe for Review ....................................26

III.    Sovereign Immunity Does Not Bar Plaintiffs' Claims ......................29

IV.    Plaintiffs Do Not Need a Congressionally Bestowed Right of Action ................................................................................................34

V.    Plaintiffs Sued the Agencies for Purposes of Relief, Not to Challenge a Final Agency Action ......................................................38

CONCLUSION ...................................................................................................39

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS...............................41

PLS.' OPP. TO MOTS. TO DISMISS
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG
...

Case 3:25-cv-00038-SLG    Document 60    Filed 02/06/26    Page 3 of 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ................................................................. 36

*Am. Sch. of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902) ........................................................ 35, 36, 37

*Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd.,*
674 F.2d 1227 (9th Cir. 1982) ................................................. 32

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531 (1987) ................................................................. 37

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ........................................................ 34, 35, 37

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................. 19

*Attias v. Carefirst, Inc.,*
865 F.3d 620 (D.C. Cir. 2017) ....................................... 12, 13, 19

*Ball v. Rodgers,*
492 F.3d 1094 (9th Cir. 2007) ................................................. 36

*Blum v. Yaretsky,*
457 U.S. 991 (1982) ............................................................ 19, 25

*Cal. Rest. Ass'n v. City of Berkeley,*
89 F.4th 1094 (9th Cir. 2024) ................................................. 15

*Carpenters Indus. Council v. Zinke,*
854 F.3d 1 (D.C. Cir. 2017) ................................................ 19, 25

*Chamber of Com. v. Reich,*
57 F.3d 1099 (D.C. Cir. 1995) ................................................. 28

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,*
333 U.S. 103 (1948) ................................................................. 31

*City of Oakland v. Lynch*,
  798 F.3d 1159 (9th Cir. 2015) ................................................................. 25

*CopyTele, Inc. v. E Ink Holdings, Inc.*,
  962 F.Supp.2d 1130 (N.D. Cal. 2013) ....................................................... 11

*Ctr. for Biological Diversity v. Kempthorne*,
  588 F.3d 701 (9th Cir. 2009) ............................................................. 16, 17

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ................................................................ 29

*Dalton v. Specter*,
  511 U.S. 462 (1994)................................................................. 31, 32, 33

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)................................................................. 19

*E.V. v. Robinson*,
  906 F.3d 1082 (9th Cir. 2018) ......................................................... 30, 32

*FDA v. All. for Hippocratic Medicine*,
  602 U.S 367 (2024)................................................................. 25

*Fowler v. Guerin*,
  899 F.3d 1112 (9th Cir. 2018) ................................................................ 27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)................................................................. 35, 38

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................. 13, 14

*Harmon v. Brucker*,
  355 U.S. 579 (1958)................................................................. 35, 37

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977)................................................................. 14

*In Wilderness Society, Inc. v. Rey*,
  622 F.3d 1251,1256–57 (9th Cir. 2010) ................................................... 18

*Kunaknana v. U.S. Army Corps of Engineers*,
  23 F.Supp.3d 1063 (D. Alaska 2014) ....................................................... 17

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682.............................................................................................*passim*

*League of Conservation Voters v. Biden*,
    843 F.App'x 937 (9th Cir. 2021)................................................................4, 7

*League of Conservation Voters v. Trump*,
    303 F.Supp.3d 985 (D. Alaska 2018) ......................................................*passim*

*League of Conservation Voters v. Trump*,
    363 F.Supp.3d 1013 (D. Alaska 2019) .......................................4, 6, 30, 32

*Lonberg v. City of Riverside*,
    571 F.3d 846 (9th Cir. 2009) ...........................................................................36

*Louisiana v. Biden*,
    No. 2:25-CV-71, 2025 WL 2808502 (W.D. La. Oct. 2, 2025)...................34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................14, 18, 37

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ................................................................31, 33

*Murthy v. Missouri*,
    603 U.S. 43 (2024)...............................................................................................18

*Nat. Res. Def. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) .................................................................19

*Nat'l Audubon Soc'y v. Haaland*,
    No. 3:20-cv-00206-SLG, 2023 WL 5984204 (D. Alaska Sept. 14, 2023) ..................15

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998)..........................................................................................28

*Pride v. Correa*,
    719 F.3d 1130 (9th Cir. 2013) ........................................................................11

*Project Veritas v. Schmidt*,
    125 F.4th 929 (9th Cir. 2025) ..........................................................................27

*Pub. Lands for the People, Inc. v. U.S. Dep't of Agric.*,
    697 F.3d 1192 (9th Cir. 2012) .......................................................................15

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ................................................................. 11

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*,
  100 F.4th 1039 (9th Cir. 2024) ................................................................. 24

*Severino v. Biden*,
  71 F.4th 1038 (D.C. Cir. 2023) ................................................................ 38

*Sioux Tribe of Indians v. United States*,
  316 U.S. 317 (1942) .................................................................................. 2

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
  108 F.4th 1128 (9th Cir. 2024) ................................................................ 27

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010) ................................................................................. 27

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009) ................................................................................. 18

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................................ 14, 18

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ................................................................ 38

*United States v. Yakima Tribal Court*,
  806 F.2d 853 (9th Cir. 1986) ................................................................... 32

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) ................................................................................. 35

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ................................................................. 10

**Statutes**

5 U.S.C. § 702 ........................................................................................... 30

5 U.S.C. § 704 ........................................................................................... 30

43 U.S.C. § 1301 ........................................................................................ 3

43 U.S.C. § 1331 *et seq* ............................................................................ 3

PLS.' OPP. TO MOTS. TO DISMISS
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG
vii
Case 3:25-cv-00038-SLG    Document 60    Filed 02/06/26    Page 7 of 49

43 U.S.C. § 1332 ................................................................................................... 3

43 U.S.C. § 1334 ............................................................................................... 3, 4

43 U.S.C. § 1337 ................................................................................................... 4

43 U.S.C. § 1340 ................................................................................................... 4

43 U.S.C. § 1341 ............................................................................................... 1, 4

43 U.S.C. § 1344 ............................................................................................... 3, 4

43 U.S.C. § 1351 ................................................................................................... 4

44 U.S.C. § 1507 ................................................................................................. 11

**Regulations**

30 C.F.R. Part 550 ............................................................................................... 4

30 C.F.R. Part 551 ......................................................................................... 4, 26

**Federal Register**

48 Fed. Reg. 10605 (Mar. 14, 1983) ................................................................. 3

91 Fed. Reg. 3534 (Jan. 27, 2026) ................................................................... 20

91 Fed. Reg. 3537 (Jan. 27, 2026) ................................................................... 20

**Other Authorities**

Fed. R. Civ. P. 8 ................................................................................................. 12

U.S. Const. Art. IV, § 3, cl. 2 ....................................................................... 2, 33

## INTRODUCTION

In this action, Plaintiffs challenge President Trump's unlawful attempt to revoke two prior presidents' permanent withdrawals of Outer Continental Shelf ("OCS") areas from oil and gas leasing pursuant to Section 12(a) of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1341(a). Under the U.S. Constitution, Congress holds sole authority over lands and waters that are the property of the United States, except to the degree it explicitly delegates that authority to the executive branch. Through passage of OCSLA in 1953, Congress authorized presidents to preserve federal offshore areas by withdrawing them from leasing. Eight presidents have used that power to provide protections for selected areas of the OCS. Consistent with this authority, Presidents Obama and Biden permanently withdrew certain OCS areas in the Arctic, Atlantic, and Pacific Oceans, and the Gulf of Mexico from oil and gas leasing while in office.

Until 2017, no president had ever attempted to reverse a permanent withdrawal, as there is no statutory or constitutional authority for doing so. Nonetheless, in April 2017, President Trump issued an executive order purporting to reverse the Arctic and Atlantic Ocean withdrawals made by President Obama. Several Plaintiffs in this action filed suit, and this Court agreed that President Trump's action was unlawful and in excess of his authority under OCSLA. That case, on appeal, was ultimately mooted when those protections were restored by President Biden, who made additional permanent OCS withdrawals while in office.

Notwithstanding this Court's prior ruling, President Trump again in January 2025 issued an executive order purporting to revoke the permanent withdrawals made by Presidents Biden and Obama, while also directing that these areas be open for expedited oil and gas development and initiating a new five-year planning process to do so.

The attempts by Defendants and Intervenor State of Alaska ("Alaska") to derail this action by raising numerous jurisdictional issues, which this Court previously addressed and rejected, lack merit. *See League of Conservation Voters v. Trump*, 303 F.Supp.3d 985, 993–1001 (D. Alaska 2018) (*"League of Conservation Voters I"*). This action threatens imminent injury, including from seismic survey activity that often precedes offshore leasing by years, to Plaintiffs' members who use and enjoy the resources of the withdrawn areas for recreational, aesthetic, commercial, and subsistence purposes. Because of these injuries, Plaintiffs' claims are also ripe for review. Moreover, sovereign immunity never attaches to unconstitutional or *ultra vires* actions so a statutory waiver is unnecessary. Furthermore, Plaintiffs' claims do not hinge on a statutory right of action or challenge a final agency action.

Consequently, and consistent with its prior ruling, the Court should deny the motions to dismiss.

## LEGAL BACKGROUND

The Property Clause of the Constitution gives Congress the "exclusive[]" power to manage the United States' lands and associated resources. *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942); *see* U.S. Const. Art. IV, § 3, cl. 2. Through the

enactment of OCSLA, Congress shared with the Executive Branch a discrete part of its constitutional authority over federal lands and waters.

OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq*. The OCS extends from the outer boundary of state waters, typically three nautical miles from shore, to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id*. §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983). The OCS consists of approximately 3.2 billion acres.[1]

Under OCSLA, Congress granted the Secretary of the Interior authority to manage oil and gas activities on the OCS. 43 U.S.C. §§ 1334(a), 1344(a). This management "shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS]," as well as "the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments." *Id*. §§ 1344(a)(1), 1332(3), 1334(a). OCSLA further directs that offshore development shall be "subject to environmental safeguards," consistent with "national needs," and operations should be conducted so as to "prevent or minimize … damage to the environment." *Id*. § 1332(3), (6); Sec. Am. & Supp. Compl. for Declaratory & Inj. Relief ("Compl.") ¶ 28, Dkt. 53.

---

[1] Bureau of Ocean Energy Management, Outer Continental Shelf, https://www.boem.gov/oil-gas-energy/leasing/outer-continental-shelf.

Under this framework, Section 12(a) provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." 43 U.S.C. § 1341(a). As Defendants acknowledge, this provision "allow[s] the President to reserve areas of the OCS from disposition by leasing, including for oil and gas development." Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Br.") 5, Dkt. 57-1; *see League of Conservation Voters v. Trump*, 363 F.Supp.3d 1013 (D. Alaska 2019) ("*League of Conservation Voters II*"), *vacated and remanded sub nom.*, *League of Conservation Voters v. Biden*, 843 F.App'x 937 (9th Cir. 2021) ("*League of Conservation Voters III*").

For areas not withdrawn, OCSLA establishes four distinct stages for oil and gas development: (1) the development of a five-year, national offshore leasing program; (2) issuance of oil and gas leases; (3) approval of lessees' exploration plans; and (4) approval of lessees' development and production plans. 43 U.S.C. §§ 1337, 1340, 1344, 1351; 30 C.F.R. Parts 550, 551; Compl. ¶ 30. Certain activities, such as seismic exploration, can occur before or during these stages in accordance with regulations established pursuant to the Secretary of the Interior's rulemaking authority. 43 U.S.C. §§ 1334(a), 1340(a), (b), (g); *see also* 30 C.F.R. Parts 550, 551; Compl. ¶ 31.

## FACTUAL AND PROCEDURAL BACKGROUND

There is a long history of presidential withdrawals of areas from oil and gas leasing under OCSLA, both permanent and time-limited, dating back to 1960 when President Eisenhower withdrew areas of the Key Largo Coral Reef Preserve.

Compl. ¶ 64. Since then, Presidents Nixon, George H.W. Bush, Clinton, George W. Bush, Obama, Biden, and even President Trump have issued withdrawals. *Id*. Some of these covered large areas: President Clinton's withdrawals covered 300 million acres, while President Biden's withdrawals covered more than 625 million acres. *Id*.

**I.      President Obama's Withdrawals and *League of Conservation Voters v. Trump***

On January 27, 2015, pursuant to Section 12(a), President Obama permanently withdrew coastal areas in the Arctic's Beaufort and Chukchi Seas and the Hanna Shoal region in the Chukchi Sea from oil and gas leasing. Compl. ¶ 66. The President cited the critical importance of these areas to subsistence use by Alaska Natives as well as for wildlife and wildlife habitat, and his intention to ensure that the unique resources of these areas remain available for future generations. *Id*.

On December 9, 2016, President Obama permanently withdrew areas of the Northern Bering Sea from future oil or gas leasing. Compl. ¶ 67. And on December 20, 2016, President Obama permanently withdrew all additional unleased portions of the Chukchi and Beaufort Seas in Alaska that were not already withdrawn—except for certain nearshore OCS lease blocks in the Beaufort Sea Planning Area—as well as twenty-six major canyons and canyon complexes offshore the Atlantic coast, from future oil and gas leasing. *Id*. ¶ 68.

However, on April 28, 2017, President Trump issued Executive Order 13795, entitled "Implementing an America-First Offshore Energy Strategy." Compl. ¶ 72. Section 4(c) of that order purported to revoke President Obama's December 9, 2016

Northern Bering Sea withdrawal. Compl. ¶ 72. Section 5 of that order purported to revoke President Obama's January 27, 2015 and December 20, 2016 Atlantic and Arctic Ocean withdrawals. *Id*.

On May 3, 2017, conservation groups, including several Plaintiffs in this action, challenged President Trump's action as violating the Property Clause and as *ultra vires* in a complaint filed in this Court. Compl. ¶ 74. As here, Defendants and Intervenors filed motions to dismiss the action on jurisdictional grounds, alleging that: "(1) the Federal Defendants are immune from suit under sovereign immunity; (2) Plaintiffs do not have a private right of action; (3) a court cannot issue declaratory relief against the President of the United States; and (4) Plaintiffs lack Article III standing." *League of Conservation Voters I*, 303 F.Supp.3d at 993. This Court denied the motions to dismiss on all grounds. *Id*. at 993–1001.

On March 29, 2019, the Court held that Section 12(a) did not authorize President Trump to revoke a prior withdrawal and thereby vacated the relevant portion of Executive Order 13795. *League of Conservation Voters II*, 363 F.Supp.3d at 1020–31. The Court also affirmed its prior jurisdictional rulings. *Id*. at 1019–20.

Defendants and Intervenors appealed. Compl. ¶ 75. However, prior to a decision on the merits, President Biden issued Executive Order No. 13990 on January 20, 2021. *Id*. Among other items, Executive Order 13990 reinstated President Obama's withdrawals

and also revoked Executive Order 13795. Compl. ¶ 75. Based on these developments, the

Ninth Circuit held that the case was moot. *Id*.[2]

## II. President Biden's Withdrawals

During his term in office, President Biden exercised his Section 12(a) authority on

two occasions relevant here. Compl. ¶¶ 77–78. On March 13, 2023, President Biden

issued a memorandum withdrawing remaining areas of the Arctic's Beaufort Sea not

previously withdrawn from oil and gas leasing. *Id*. ¶ 77. On January 6, 2025, President

Biden issued two memoranda to withdraw OCS areas in the Pacific Ocean, the Atlantic

Ocean, the Eastern Gulf of Mexico and small portions of the Central Gulf of Mexico, and

the Northern Bering Sea in Alaska. *Id*. ¶ 78. Both memoranda stated that these

withdrawals were consistent with principles of responsible public stewardship, and with

due consideration of the irreplaceable marine and coastal environments, wildlife habitat,

and the vulnerability of these ecosystems and coastal communities to oil spills. *Id*. ¶¶ 77–

78.

## III. President Trump's Latest Attempt to Reverse Withdrawals and Expedite Oil and Gas Development in the OCS

On January 20, 2025, President Trump issued Executive Order 14148 entitled

"Initial Rescissions of Harmful Executive Orders and Actions." Compl. ¶ 82. In Section 2

of that order, President Trump listed dozens of "executive actions" that "are hereby

---

[2] While the Ninth Circuit vacated *League of Conservation Voters II*, it did not vacate this Court's opinion in *League of Conservation Voters I*. *See League of Conservation Voters III*, 843 F.App'x at 938–39.

PLS.' OPP. TO MOTS. TO DISMISS
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG

7

Case 3:25-cv-00038-SLG    Document 60    Filed 02/06/26    Page 15 of 49

revoked," without citing any authority for those revocations. *Id*. Several provisions of Executive Order 14148 are relevant here.

Section 2(f) purported to revoke President Biden's Executive Order 13990, which was the basis for the Ninth Circuit's mootness determination in *League of Conservation Voters III*. *Id*. Revoking Executive Order 13990 did two things relevant to this lawsuit. *Id*. First, it purported to revoke President Biden's reinstatement of President Obama's withdrawals for the unleased portions of the Chukchi Sea and Beaufort Sea and twenty-six offshore canyon and canyon complexes in the Atlantic Ocean. *Id*. Second, it rescinded Executive Order 13990's revocation of Executive Order 13795, in which President Trump purported to revoke President Obama's Arctic Ocean and Atlantic canyon withdrawals. *Id*. In doing so, Executive Order 14148 effectively reinstated Executive Order 13795's revocation of the Obama withdrawals, the action at issue in *League of Conservation Voters v. Trump*. *Id*.

Section 2(ccc) of Executive Order 14148 purported to revoke President Biden's March 13, 2023 Presidential Memorandum which withdrew remaining areas of the Beaufort Sea not previously withdrawn from oil and gas leasing. *Id*. Further, Section 2(vvv) and Section 2(www) revoked President Biden's January 6, 2025 Presidential Memoranda that withdrew areas in the Pacific and Atlantic Oceans, Eastern Gulf and small portions of the Central Gulf, and the Northern Bering Sea. *Id*.

Treating Executive Order 14148 as binding and these prior withdrawals as being revoked, Defendants have already taken several actions to proceed with oil and gas

leasing in these areas. Compl. ¶ 83. On February 3, 2025, Defendant Burgum issued three orders to expedite OCS oil and gas exploration and development. Secretarial Order 3420, entitled "Announcing President Trump's Revocation of Former Outer Continental Shelf Withdrawals," stated the Department of the Interior's commitment "to the advancement of President Trump's energy policies, including to encourage energy exploration and production … on the [OCS]." *Id*. The order instructs that "Bureaus and Offices are to take all actions available to expedite the leasing of the OCS for oil and gas exploration and production." *Id*.

Defendant Burgum also issued Secretarial Order 3417, entitled "Addressing the National Energy Emergency," which directs all Bureaus and Offices of the Department to "identify the emergency authorities available to them, as well as all other legal authorities, to facilitate the identification, permitting, leasing, development, production, … and generation of domestic energy resources and critical minerals including, but not limited to, on Federal lands and the Outer Continental Shelf." *Id*. ¶ 84. Further, Secretarial Order 3418, entitled "Unleashing American Energy," included a directive for Assistant Secretaries to prepare a plan within fifteen days to "suspend, revise, or rescind" the current 2024–2029 national offshore leasing program governing OCS oil and gas leasing and to review the "program for offshore oil and gas leasing to assess the need for changes to meet the Nation's energy goals." *Id*. ¶ 85.

On April 30, 2025, Interior published a Federal Register notice requesting information and comments on a new five-year leasing program. Compl. ¶ 62. Interior

reiterated President Trump's desire to "encourage energy exploration and production on federal lands and waters, including on the [OCS]," and noted that it "may receive new [geological and geophysical] permit applications in the near future" in the Atlantic OCS. *Id*. Interior further stated that it would "analyze all 27 OCS planning areas, including areas that may be currently unavailable for leasing." *Id*.

On November 14, 2025, the Secretary issued Secretarial Order 3445[3] announcing Interior's intention to "terminate" the current five-year leasing program and replace it "with a new, more expansive ... Program as soon as possible" and "not later than 1 year after the date of the issuance of this Order." On November 20, 2025, Interior announced its first proposal for the new program, which includes thirty-four offshore lease sales, including twenty-one sales off the coast of Alaska, six in the Pacific, and seven in the Gulf, including two in the Eastern Gulf. Defs.' Br. 9. At least sixteen of these proposed sales are in OCS areas withdrawn by Presidents Obama and Biden.

**STANDARD OF REVIEW**

Defendants and Alaska move to dismiss Plaintiffs' lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting the Court lacks subject-matter jurisdiction. Defs.' Br. 9; Alaska's Mem. Supp. Mot. Dismiss ("AK Br.") 6, Dkt. 59-1. A jurisdictional attack under Rule 12(b)(1) may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A facial attack accepts the truth of the plaintiff's allegations

---

[3] U.S. Dep't of the Interior, Secretarial Order 3445–Unleashing American Offshore Energy (Nov. 14, 2025), https://www.doi.gov/document-library/secretary-order/so-3445-unleashing-american-offshore-energy.

PLS.' OPP. TO MOTS. TO DISMISS
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG

10

Case 3:25-cv-00038-SLG    Document 60    Filed 02/06/26    Page 18 of 49

but asserts that they "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The district court resolves such an attack by accepting the plaintiff's allegations as true, drawing all reasonable inferences in the plaintiff's favor, and determining whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). A court may consider not only the allegations in the complaint but also documents attached to it and judicially noticeable facts. *CopyTele, Inc. v. E Ink Holdings, Inc.*, 962 F.Supp.2d 1130, 1135–36 (N.D. Cal. 2013) (citing cases); *see* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed").

By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. *Safe Air for Everyone*, 373 F.3d at 1039. In resolving a factual attack, the court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment and need not presume the truthfulness of the plaintiff's allegations. *Id*.

Alaska brings a facial challenge to Plaintiffs' Complaint. AK Br. 5–6. Defendants claim to bring both a facial challenge and a factual challenge "[t]o the extent the Defendants challenge Plaintiffs' assertions of imminent harm with factual information in the standing and ripeness arguments." Defs.' Br. 10 n.5. However, Defendants do not dispute the truth of any specific factual allegations in the Complaint, but rather contend that the Complaint itself fails to establish this Court's jurisdiction. *See, e.g.*, Defs.' Br. 1 ("The Complaint generally describes impacts that could occur from oil and gas

exploration and development, but lacks any allegation that such impacts are actually occurring or will imminently occur."). Defendants introduce the Declaration of Dr. Megan Carr to state that there are no pending seismic permits outside of the Western and Central Gulf and discuss recent oil and gas activities in Alaska. Dkt. 57-2; Defs.' Br. 16–17. However, these statements do not contradict any of Plaintiffs' allegations. Consequently, Defendants' jurisdictional challenge is a facial one.

To invoke a federal court's jurisdiction at the pleading stage, a plaintiff needs to provide only "a short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1). Given the "light burden of proof the plaintiffs bear at the pleading stage," Plaintiffs' allegations easily establish this Court's jurisdiction to decide the case. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017).

## ARGUMENT

There is no merit to the jurisdictional roadblocks raised by Defendants and Alaska, which this Court previously rejected. Plaintiffs have pled concrete and particularized injuries from President Trump's revocations, and their members face imminent harm from an action that has already taken effect. Because Plaintiffs have standing, Plaintiffs' claims are ripe for review. Sovereign immunity is also no bar, as the Court may determine that presidential action is unlawful and enjoin executive officials from acting outside their authority to the detriment of Plaintiffs' members' interests. Moreover, Plaintiffs do not need a congressionally authorized cause of action to bring claims for equitable relief from unauthorized executive actions, nor does a supposed lack of final

agency action matter, as Plaintiffs do not challenge any action under the Administrative Procedure Act ("APA").

## I.    Plaintiffs Have Standing to Bring this Action

Defendants' and Alaska's contentions that Plaintiffs' allegations are too general and fail to allege imminent harm from the President's action ignore the details in Plaintiffs' Complaint. Defs.' Br. 11–17; AK Br. 6–11. Specifically, Plaintiffs' detailed allegations describe the immediate, purposeful effect of removing an absolute bar to new oil and gas leasing and development in certain OCS areas. Defendants and industry groups have signaled their intent to undertake oil and gas exploration and development activities in these previously closed areas expeditiously and even on an emergency basis. These activities present a substantial risk of harm to the ocean environment and wildlife in ways that impair Plaintiffs' recreational, aesthetic, commercial, and subsistence interests. Consequently, Plaintiffs' allegations easily clear the "low bar to establish their standing at the pleading stage." *See Attias*, 865 F.3d at 622.

### A.    Legal Standard

Plaintiffs are organizations that have associational standing to sue "on behalf of [their] members when [their] members would otherwise have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). For members to establish standing, they "must show (1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision." *Id*. at 180–81.[4] In environmental cases, plaintiffs may satisfy the injury-in-fact requirement by "aver[ring] that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened" as a result of the challenged conduct. *Laidlaw*, 528 U.S. at 183 (cleaned up).

As the Supreme Court has stated, "each element [of standing] must be supported … with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id*. (cleaned up). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up).

### B. Plaintiffs' Allegations Demonstrate a Concrete and Particularized Injury

Defendants first argue that Plaintiffs' allegations are too general to show a concrete and particularized injury because they fail to show exactly which areas of the OCS that their members use and enjoy or plan to visit in the future. Defs.' Br. 11–14.

---

[4] Defendants and Alaska do not challenge any other elements of Plaintiffs' associational standing, and Plaintiffs readily meet these elements. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Safeguarding the Gulf, Atlantic, Pacific, and Arctic Oceans from harmful offshore oil and gas activities is "germane" to Plaintiffs' organizational purposes. *Id*.; *see* Compl. ¶¶ 9–19. Moreover, Plaintiffs' members need not participate in this litigation because none of the claims asserted or the relief sought requires individualized proof. *Hunt*, 432 U.S. at 342–43.

However, on a Rule 12(b) motion to dismiss, courts do not require such specific evidence, but "presume that general allegations embrace those specific facts that are necessary to support the claim." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024) (quoting *Lujan*, 504 U.S. at 561); *see also Nat'l Audubon Soc'y v. Haaland*, No. 3:20-cv-00206-SLG, 2023 WL 5984204, at *7 (D. Alaska Sept. 14, 2023) ("At this stage in the litigation, Plaintiffs need not provide declarations from their members or plead their injury with greater particularity to demonstrate associational standing.").

Plaintiffs' allegations satisfy this light burden. *See Pub. Lands for the People, Inc. v. U.S. Dep't of Agric.*, 697 F.3d 1192, 1195–96 (9th Cir. 2012). As discussed in the Complaint, Plaintiffs allege that their members use and enjoy affected areas of the Arctic, Pacific, and Atlantic Oceans, and Gulf of Mexico, and adjacent coastal areas for recreational, aesthetic, subsistence, scientific, and other purposes, and plan to continue doing so in the future. Compl. ¶¶ 9–23; *see, e.g., id.* ¶ 13 ("Surfrider's members recreate in and enjoy the coastal areas impacted by the challenged action, and derive recreational, aesthetic, and economic benefits from a clean and healthy ocean ecosystem and the diverse marine life that resides there"); *id.* ¶ 15 ("The Center has thousands of members who live and recreate in coastal areas impacted by the challenged action and who appreciate and benefit from wildlife threatened by noise pollution, vessel traffic, oil

spills, and/or climate pollution caused by oil and gas activity").[5] As Plaintiffs further allege, President Trump's purported revocations of OCS withdrawals harm these interests because they will allow oil and gas exploration or development that will destroy, degrade, or diminish the wild and natural state of these areas. Compl. ¶¶ 9–23; *see, e.g.*, *id*. ¶ 22 (activities allowed by Executive Order 14148 "will degrade affected OCS areas and adjacent coastal environments and harm wildlife, their habitats, and the interests of Plaintiffs and their members."). These oil and gas activities include seismic surveying, which often precedes oil and gas lease sales by several years and poses immediate and severe risks to the affected regions and wildlife. *Id*. ¶¶ 20–23, 44–49.

At the pleading stage, these allegations are sufficient to establish a concrete and particularized injury from the challenged action. As the Ninth Circuit recognized in *Center for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009), the degree of geographic specificity required depends on the size of the areas that the government's action harms. In that case, the Court held that plaintiffs had standing to challenge a regulation governing the "take" of polar bears across the entire Beaufort Sea and neighboring coastal areas, with no need to identify the overlap of specific projects with specific areas plaintiffs used, because the effects of the regulation extended—and were

---

[5] Defendants note that the Complaint contains no allegations regarding Plaintiffs' members' use of the Northern Bering Sea Climate Resilience Area. Defs.' Br. 12 n.7. As stated in the Complaint, Plaintiffs "are not challenging President Trump's purported revocation of areas of the Northern Bering Sea." Compl. ¶ 67 n.9.

PLS.' OPP. TO MOTS. TO DISMISS
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG
16

Case 3:25-cv-00038-SLG    Document 60    Filed 02/06/26    Page 24 of 49

felt by plaintiffs—across a broad geographic area (i.e., everywhere polar bears roam). *Id.* at 707–08.

Similarly, in *League of Conservation Voters I*, this Court noted that "the area impacted by the Executive Order is 128 million acres located in the Arctic and Atlantic Oceans," and, as here, plaintiffs alleged "that they visit or otherwise use and enjoy the Atlantic Ocean, including near deepwater canyons, the Chukchi and Beaufort Seas, and coastal regions adjacent to these waters." 303 F.Supp.3d at 1000 (cleaned up). As the Court found, "[a]lthough the geographic area is very large, it is discrete and defined. Therefore, Plaintiffs have alleged a sufficiently specific geographic area for their alleged harms for Article III standing." *Id.*

The cases cited by Defendants do not arise in the context of a motion to dismiss at the pleading stage and are otherwise easily distinguishable. Defs.' Br. 13. In *Kunaknana v. U.S. Army Corps of Engineers*, 23 F.Supp.3d 1063 (D. Alaska 2014), plaintiffs challenged a site-specific development drilling proposal, the effects of which were confined to a relatively small geographic area surrounding the project. *Id.* at 1084. Unremarkably, this Court held that plaintiffs lacked standing when, on a motion for summary judgment, they failed to show that their members had plans to use areas affected by the development project. *Id.* at 1082–84. By contrast, the Court concluded that other plaintiffs, who used the areas affected by the project (as Plaintiffs here allege their members do), did demonstrate standing. *Id.* at 1084–85.

In *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the challenged decision—a regulation exempting small post-fire timber-salvage projects from certain public notice and appeal procedures—affected only specific and relatively small geographic areas, and plaintiffs lacked standing because they did not establish their use of those affected areas at the summary judgment stage. *Id.* at 490, 495–96. *In Wilderness Society, Inc. v. Rey*, 622 F.3d 1251,1256–57 (9th Cir. 2010), the court concluded that plaintiffs' declarant failed to establish at summary judgment that the challenged regulations would harm his use of the specific area he wished to visit.

None of these cases apply here, where—at the pleading stage—Plaintiffs have sufficiently alleged that they use the affected areas and their interests and use of those areas are harmed by the removal of protections that would otherwise prevent future oil and gas exploration and development.

### C. Harm Is Imminent Now that the Withdrawn OCS Areas Are Available and Being Considered for Oil and Gas Exploration and Development

Defendants and Alaska also raise several contentions that Plaintiffs' alleged injuries are insufficiently imminent, each of which lack merit. Defs.' Br. at 14–17; AK Br. 6-10. As an initial matter, the Supreme Court has made it clear that "imminence" is "concededly a somewhat elastic concept," *Lujan*, 504 U.S. at 564 n.2, and a "substantial risk" of future harm can be sufficient to support standing, *Murthy v. Missouri*, 603 U.S. 43, 69 (2024); *Susan B. Anthony List*, 573 U.S. at 158 ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." (citation omitted)).

The imminence inquiry is a practical one, guided by common sense. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017); *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) (deeming it "a hardly-speculative exercise in naked capitalism to predict that facilities would take advantage of" a challenged rule loosening regulatory restrictions (cleaned up)). Courts may consider, for example, actors' motivation and past conduct. *See, e.g.*, *Attias*, 865 F.3d at 628–29 (holding that plaintiffs whose personal medical insurance accounts had been hacked were at substantial risk of injury because, as a general matter, hackers are motivated, "sooner or later," to file false claims or perpetrate identity theft (citation omitted)); *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982) (finding injury-in-fact based on nursing homes' past conduct in discharging residents and the threat that they would repeat the behavior in the future); *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (citing evidence of past behavior to establish injury-in-fact).

Under this standard, Plaintiffs' Complaint adequately alleges a substantial risk of future harm from the challenged action. Defendants' actions since the first day of President Trump's second term, industry statements, and past conduct all demonstrate that the attempted revocation of the permanent protections provided by the withdrawals poses imminent harm to Plaintiffs' members from OCS oil and gas exploration and development.

Pls.' Opp. to Mots. to Dismiss
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG
19

Case 3:25-cv-00038-SLG    Document 60    Filed 02/06/26    Page 27 of 49

<u>Defendants have taken numerous actions to expedite OCS oil and gas exploration and development</u>

On January 20, 2025, President Trump not only issued Executive Order 14148 undoing President Obama's and Biden's withdrawals, but also issued an executive order entitled "Unleashing American Energy" which declared that "[i]t is the policy of the United States … to encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf." Compl. ¶ 58. As discussed above, Defendant Burgum soon thereafter issued a series of Secretarial Orders to implement this policy and directed Interior to "take all actions available to expedite the leasing of the OCS for oil and gas exploration and production." Compl. ¶¶ 83–85.

Defendants have proposed a new five-year program, to be completed in November 2026, that includes lease sales in areas of the Arctic, Pacific, and Eastern Gulf that Presidents Obama and Biden withdrew, including a Beaufort Sea lease sale this year. *See infra* at 10; Defs.' Br. 9; AK Br. 16. On January 27, 2026, Defendants issued a call for information and nominations for lease sales in the Southern and Central California Planning Areas, noting that first sales in these areas are "tentatively scheduled to occur near the beginning of the" new five-year program. 91 Fed. Reg. 3534, 3535 (Jan. 27, 2026); 91 Fed. Reg. 3537, 3537 (Jan. 27, 2026). Defendants have also acknowledged that they "may receive new [geological and geophysical] permit applications in the near future" in the Atlantic OCS region. Compl. ¶ 62.

2. Industry has expressed significant interest in OCS exploration and development activities

Industry has also expressed interest in exploring and developing oil and gas in these reopened OCS areas. Intervenor American Petroleum Institute ("API") has applauded President Trump "for moving swiftly to chart a new path where U.S. oil and natural gas are embraced, not restricted." Compl. ¶ 59. In two separate cases challenging President Biden's withdrawals, API and other industry groups have claimed "clear and unquestionable" harm from being prevented from actively exploring OCS areas and leasing them for oil and gas development. *Id*. ¶ 81.[6] API has also admitted in this case that "companies in the oil and natural gas industry are interested in exploration and development in the Beaufort Sea area." Def. Int. API's Answer & Affirmative Defenses to Sec. Am. & Suppl. Compl. ¶ 49, Dkt. 58.

3. Seismic surveys and their resulting impacts can now occur in reopened OCS areas

Harm from seismic surveys is one of the first and most harmful impacts that will result from reopening OCS areas to oil and gas development. Compl. ¶ 44. Seismic surveying is often conducted two to four years prior to lease sales to identify areas with promising oil and gas prospects, although companies also have sought approval to conduct seismic surveys even when lease sales are more than four years away and not included in an existing or proposed leasing program. *Id*.

---

[6] Defendants' statements regarding prior federal leasing in the Beaufort Sea, *see* Defs.' Br. 16 n.10, do not refute Plaintiffs' allegations regarding the substantial industry interest in the State of Alaska's 2024 lease sale in this area. Compl. ¶ 49.

Seismic surveys typically deploy arrays of airguns, which are towed behind ships across broad swaths of the ocean. Compl. ¶ 45. Seismic airgun arrays fire intense blasts of energy into the water about every ten to twelve seconds for days, weeks, or months at a time depending on the length of the survey. *Id.* A large seismic array can produce effective levels of sound—above 250 decibels—greater than virtually any other man-made source, save explosives. *Id.* These noise blasts penetrate deep into the seafloor and rebound to the surface for analysis, with potentially devastating impacts on marine life. *Id.* ¶¶ 45–47. For example, in July 2014, when Interior opened the Mid- and South Atlantic OCS to seismic exploration, it estimated that these activities could result in up to 138,000 injuries and 13.4 million disturbances of marine mammals, including disruptions in vital behaviors such as feeding and mating, over the first nine years. *Id.* ¶ 46.

### 4. Past practice shows that harm is imminent

Past practice confirms the immediacy of the threat. In 2017, following President Trump's first attempt at revoking President Obama's withdrawals, Interior called for expedited consideration of seismic survey permits, a streamlined permitting approach for such activities, as well as immediate development of a new national offshore leasing program to open up previously excluded areas. Compl. ¶ 73. In the Atlantic, at least six seismic operation companies applied for permits to conduct deep-penetration seismic surveys, while at least one company applied for a permit to conduct a seismic survey in federal waters offshore Huntington Beach, California. *Id.* ¶ 53. Concurrently, several

Pls.' Opp. to Mots. to Dismiss
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG
22

seismic firms applied to the National Marine Fisheries Service ("NMFS") for authorization to injure and harass marine mammals during their activities. *Id.*

Based on similar allegations, this Court in *League of Conservation Voters I* determined that plaintiffs had shown an imminent risk of harm from President Trump's revocation of President Obama's withdrawals. *League of Conservation Voters I*, 303 F.Supp.3d at 997–99. As the Court held:

> The Executive Order's clear intent to expedite energy production in the Arctic and Atlantic Oceans, the oil industry's eagerness to obtain seismic surveying permits, and the fact that seismic surveying typically precedes oil and gas lease sales, together indicate that Plaintiffs have adequately alleged a substantial risk of harm from the passage of Executive Order 13795 that is 'imminent' for purposes of Article III standing.

*Id.* at 999.

5. <u>Imminence does not require exploration and development activities to be already occurring</u>

Despite these findings, Defendants and Alaska contend that such harms are not imminent here because Plaintiffs have failed to identify specific seismic permit applications in the relevant OCS areas. Defs.' Br. 15–17;[7] AK Br. 7–11. But those contingencies do not make seismic surveys unlikely, or otherwise defeat imminence. As discussed above, Defendants are seeking to expand and expedite oil and gas exploration

---

[7] Defendants also claim that "much" of the areas withdrawn by President Biden "remain withdrawn" pursuant to earlier actions taken by President Trump. Defs.' Br. 15. Yet Defendants identify only a few specific areas—the Eastern Gulf, South Atlantic and Straits of Florida Planning Areas, and North Carolina portion of the Mid-Atlantic Planning Area—which President Trump withdrew from September 2020 through 2032. In other words, most of the OCS is now available for oil and gas leasing. *See id.* ("To be sure, some areas in the Mid-Atlantic, North Atlantic, and the Pacific are no longer withdrawn due to President Trump's 2025 Order.").

on the OCS though its new five-year leasing program and anticipate seismic permit applications "in the near future." Compl. ¶ 62; *see supra* at 20–22.

Defendants similarly argue that "any actual oil and gas development" in these areas "is likely at least a couple of years away" because they are not part of the current five-year leasing program. Defs.' Br. 17; AK Br. 3, 10. As noted above, however, Defendants have already announced that they will complete a "new, more expansive" five-year leasing program no later than November 14, 2026. *Supra* at 10. And Defendants are planning for a Beaufort Sea lease sale *this year*, two California lease sales in 2027, as well as twenty additional sales in Alaska waters between 2027 and 2031. Defs.' Br. 9 n.4;[8] AK Br. 16. In any event, the fact that such oil and gas development is not occurring immediately does not prevent a showing of imminent harm. *See, e.g., San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 100 F.4th 1039, 1054 (9th Cir. 2024) (finding substantial risk of future harm based on likelihood of nuclear power plant continuing operations past its initial forty-year license term).

### D. The Causation Standard is Met Because the Oil and Gas Industry is Likely to Explore and Develop Reopened OCS Areas

There is also no merit to Alaska's related assertions that there is no "causal chain" between the challenged action and Plaintiffs' alleged injuries because third parties must seek permits to explore and develop the Alaska OCS. AK Br. 11–14. As the Supreme Court recently stated, "[i]n cases of alleged future injuries to unregulated parties from

_____

[8] *See* https://www.boem.gov/oil-gas-energy/national-program/details-secretarys-1st-proposal.

PLS.' OPP. TO MOTS. TO DISMISS
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG

Case 3:25-cv-00038-SLG    Document 60    Filed 02/06/26    Page 32 of 49

government regulation, the causation requirement and the imminence element of the injury in fact requirement can overlap." *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 385 n.2 (2024). In such circumstances, "the plaintiff must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Id.* at 383 (cleaned up).

As discussed above, the Trump administration's stated purpose for the challenged action is to reopen OCS areas for expedited oil and gas exploration and development, and industry has stated its intention to explore and develop oil and gas in these reopened OCS areas, including in Alaska. *See supra*, Argument I.C. As this Court held in *League of Conservation Voters I*, "although third parties must obtain permits before seismic surveying and other activities may occur, there is no indication that the government will not promptly grant such permits, particularly in light of the Executive Order's stated purpose of expediting energy production." 303 F.Supp.3d at 997; *see also Blum*, 457 U.S. at 1000 (finding plaintiff established injury-in-fact notwithstanding uncertain future contingencies based on third-party actions); *City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (finding plaintiff established injury-in-fact where its harm—lost tax revenue from a marijuana dispensary—depended on a series of uncertain contingent future events), *cert. denied*, 577 U.S. 1218 (2016); *Carpenters Indus. Council*, 854 F.3d at 7 (recognizing harm contingent on timber companies' future inability to find sources to replace lost timber from land designated as critical habitat).

Alaska argues that the "facts here are different" than *League of Conservation Voters I* because "BOEM lacks discretion to issue seismic permits" in previously withdrawn areas until the next five-year plan is finalized. AK Br. 12. This is incorrect. BOEM's consideration and issuance of permits for seismic exploration is not dependent on an area's inclusion in the current five-year plan. *See* Compl. ¶ 31; 30 C.F.R. pt. 551. For example, in *League of Conservation Voters I*, industry groups called for seismic surveying to proceed "without delay" following President Trump's April 28, 2017 executive order to "allow for informed decisions as a new five-year lease plan is developed." 303 F.Supp.3d at 998. Indeed, Defendants' recent draft five-year program states explicitly that "National OCS Program approval is not a prerequisite to collect [geological and geophysical] data."[9]

In sum, President Trump's attempt to revoke prior withdrawals and expedite energy production in certain OCS areas, along with industry's stated intent to explore and develop oil and gas resources in these areas, demonstrates that Plaintiffs have adequately alleged a substantial risk of harm to their members' recreational, aesthetic, commercial, and subsistence interests for purposes of Article III standing.

## II.    Plaintiffs' Legal Claims Are Ripe for Review

There is no merit to Defendants' and Alaska's arguments that Plaintiffs have failed to plead ripe claims. Defs.' Br. 17–21; AK Br. 10–11. Because Plaintiffs have adequately

---

[9] *See* https://www.boem.gov/sites/default/files/documents/oil-gas-energy/national-program/11th_National_OCS_Program_1stAnalysis_and_Proposal_508.pdf at 5-9.

alleged an injury-in-fact, as discussed above, this case is constitutionally ripe. *See Project Veritas v. Schmidt*, 125 F.4th 929, 941 (9th Cir. 2025) ("The constitutional component overlaps with the analysis of 'injury in fact' for Article III standing."). As before, the Court should reject Defendants' invitation to decline jurisdiction under the discretionary doctrine of prudential ripeness. *See League of Conservation Voters I*, 303 F.Supp.3d at 1001 n.115. As the Ninth Circuit has stated, "prudential ripeness is a disfavored judge-made doctrine that 'is in some tension with [the Supreme Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.'" *Fowler v. Guerin*, 899 F.3d 1112, 1116 n.1 (9th Cir. 2018) (quoting *Susan B. Anthony List*, 573 U.S. at 167).

Should the Court consider prudential ripeness, it evaluates two factors—"the fitness of the issues for judicial decision and the hardship of withholding court consideration"—both of which are readily satisfied here. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (cleaned up). First, Plaintiffs' claims are unquestionably fit for judicial review. "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1139 (9th Cir. 2024) (citations omitted). Here, President Trump's executive order is final, and resolution of Plaintiffs' claims turns on purely legal issues: whether that order was *ultra vires* of his statutory and constitutional authority. Compl. ¶¶ 87–98. Defendants identify no "further factual development" that would aid the Court's resolution of these legal

questions. How agency officials might make subsequent permitting and leasing decisions in areas covered by the order, *see* Defs.' Br. 18–21, will not clarify the question of whether the order itself exceeded the President's authority.

Where, as here, the fitness factors favor immediate review, a court need not even reach the hardship prong. *Chamber of Com. v. Reich*, 57 F.3d 1099, 1101 (D.C. Cir. 1995). Repeating its standing argument, Defendants' primary claim is that no harm will occur to Plaintiffs until Interior takes further steps to authorize oil and gas exploration or development. Defs.' Br. 18. However, as discussed above, Plaintiffs' demonstration of injury-in-fact illuminates the hardship of delaying adjudication given the substantial risk of near-term oil and gas activities, including seismic surveys, caused by the President's action. *See supra*, Argument I.C. Review at this stage will also impose no hardship on Defendants or "inappropriately interfere with further administrative action." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). To the contrary, all parties will benefit from resolution of whether the President's action was lawful, before harmful and costly exploration activities proceed and public resources are expended in deciding whether to schedule lease sales for the areas at issue.

Defendants also assert that the multi-stage nature of oil and gas development under OCSLA renders the claims unripe, relying in part on a D.C. Circuit decision addressing a national offshore leasing program challenge. Defs.' Br. 19–20 (citing *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466 (D.C. Cir. 2009)). But again, Plaintiffs' threatened injuries derive most immediately from seismic surveys,

which occur outside of the five-year program framework and may precede leasing by years, and are caused by the action challenged in this case. *See supra*, Argument I.C. Moreover, the D.C. Circuit in *Center for Biological Diversity* found that plaintiffs' OCSLA-based claims were ripe because the legal violations underlying them—the agency's failure to abide by Section 18's prescriptions regarding the promulgation of a leasing program—"are implicated at the initial stage of a leasing program." 563 F.3d at 484.[10] So too with Plaintiffs' legal claims here. The violations underlying Plaintiffs' claims—the President's attempt to act beyond his constitutional and statutory authority—are implicated now, by the existing order revoking prior withdrawals, not at some later OCSLA stage.

## III. Sovereign Immunity Does Not Bar Plaintiffs' Claims

As this Court previously found in nearly identical circumstances, which Defendants fail to address, sovereign immunity does not shield the President's action in this case from judicial review. *League of Conservation Voters I,* 303 F.Supp.3d at 994 ("[T]he doctrine of sovereign immunity does not apply, and Plaintiffs are not required to demonstrate a Congressional waiver of sovereign immunity in order to bring this suit."). Where sovereign immunity applies, it bars actions against the sovereign for money damages or specific relief, unless Congress waives that immunity. But as the Supreme Court explained decades ago in *Larson v. Domestic & Foreign Commerce Corp.*, there

---

[10] Defendants cite three cases for the proposition that "individual lease sales … have no actual effects on the [OCS]," Defs.' Br. 20, yet none of these decisions consider the ripeness doctrine.

are "two types" of claims for specific relief against federal officials where no waiver is needed. 337 U.S. 682, 690 (1949). The first is "where the officer's powers are limited by statute" and he acts wholly "beyond those limitations" such that "[h]is actions are ultra vires his authority." *Id.* at 689. The second is where an officer "take[s] action in the sovereign's name" that is "claimed to be unconstitutional." *Id.* at 690. In both types of cases, "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* In other words, sovereign immunity need not be waived because it never attached to the challenged action in the first place. As in *League of Conservation Voters I*, both *Larson* exceptions to sovereign immunity apply. *See* 303 F.Supp.3d at 994.[11]

The first *Larson* exception applies because President Trump's executive order is *ultra vires*. The order's only potential source of statutory authority is Section 12(a), and Section 12(a) confers no authority on the President whatsoever to revoke existing withdrawals. Compl. ¶¶ 96–97; *League of Conservation Voters II*, 363 F.Supp.3d at 1020–31. Plaintiffs' challenge to this action therefore fits squarely within the *ultra vires* exception to sovereign immunity because the President acted without any "delegated power." *Larson*, 337 U.S. at 689–90.

---

[11] Defendants do not argue that agency officials implementing the executive order have sovereign immunity. Nor could they—the APA's waiver of sovereign immunity (5 U.S.C. § 702) for agency officials applies even when its cause of action (§ 704) does not. *See E.V. v. Robinson*, 906 F.3d 1082, 1094 (9th Cir. 2018).

There is no support for Defendants' position that it is "questionable" whether the first *Larson* exception can be applied to the President. *See* Defs.' Br. 24. Neither case Defendants cite for this proposition addresses this question; rather, both cases were decided on other grounds. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994) (assuming "that some claims that the President has violated a statutory mandate are judicially reviewable," but ultimately deciding that the statute at issue committed the decision to close military bases to the "discretion of the President"); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112–14 (1948) (finding the President's approval of international air travel routes a nonjusticiable political question). Contrary to Defendants' argument, binding precedent from *Murphy Co. v. Biden* confirms that this exception *can* be applied to the President's actions when the claim requires only that courts apply the "familiar tools of statutory construction." 65 F.4th 1122, 1130 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 1111 (2024). As the Ninth Circuit explained, "whether characterized as *ultra vires* or constitutional, the result is the same: we resolve that [the plaintiff's] claims against the President … are justiciable." *Id.* at 1129–30.

Not only can the *ultra vires* exception apply to the President, it also does apply under these facts, where the issue for judicial resolution is not "the correctness or incorrectness" of the decision, "but simply the power of the official, under the statute, to make a decision at all." *Larson*, 337 U.S. at 691 n.12.

The cases cited by Defendants are distinguishable on that basis. In *United States v. Yakima Tribal Court*, the exception did not apply because the plaintiffs challenged as

"incorrect" a decision by an official "pursuing his authorized duties," not an action "completely outside his governmental authority." 806 F.2d 853, 859–60 (9th Cir. 1986). And in *Aminoil*, the court held that the agency's determination about whether a certain piece of land was a wetland was not reviewable under the exception because a "simple mistake of fact or law does not necessarily mean that an officer of the government has exceeded the scope of his authority." *Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd.*, 674 F.2d 1227, 1233–34 (9th Cir. 1982). By contrast, this is not a case involving an alleged error in an official's discharge of his statutorily authorized duties. The President took a type of action—revoking an existing withdrawal and reopening lands to disposition—that the statute categorically does not authorize. Compl. ¶¶ 90–92, 96–97. OCSLA provides no authority whatsoever for the President's revocation of existing 12(a) withdrawals. *See League of Conservation Voters II*, 363 F.Supp.3d at 1020–31. Plaintiffs' claims concern "a want of Presidential power," not a mere "abuse of discretion." *Dalton*, 511 U.S. at 474 (quoting *Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)) (cleaned up). Accordingly, the first *Larson* exception for *ultra vires* actions applies.

The second *Larson* exception also applies here. Sovereign immunity is "per se" inapplicable to "alleged constitutional violations." *E.V. v. Robinson*, 906 F.3d 1082, 1098 (9th Cir. 2018) (quoting *Yakima Tribal Court*, 806 F.2d at 859, in parenthetical). And Plaintiffs have alleged constitutional violations: the Constitution's Property Clause provides that "Congress shall have Power to dispose of and make all needful Rules and

Regulations respecting the Territory or other Property belonging to the United States…." U.S. Const. Art. IV, § 3, cl. 2. The President has the authority to regulate such property only to the limited extent that Congress has delegated that authority to the President. In reversing President Obama's and Biden's withdrawals, President Trump intruded on Congress's non-delegated exclusive power under the Property Clause, in violation of the separation of powers doctrine. Compl. ¶¶ 90–92. Because President Trump's action is "claimed to be unconstitutional," sovereign immunity does not apply. *See Larson*, 337 U.S. at 690.

Defendants parrot *Dalton*'s warning that claims "simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims," Defs.' Br. 27, but that argument mischaracterizes Plaintiffs' Complaint. Plaintiffs are not asserting a mere "excess or abuse of discretion" granted by a statute. *Dalton,* 511 U.S. at 474 (citation omitted). Rather, Plaintiffs contend that the President assumed for himself Congress's power under the Constitution. As *Murphy* recognized, "[w]hile 'an action taken by the President in excess of his statutory authority [does not] necessarily violate[] the Constitution,' [] specific allegations regarding separation of powers may suffice" to provide a reviewable claim. 65 F.4th at 1130 (alteration in original) (quoting *Dalton*, 511 U.S. at 473). And like the *Murphy* plaintiffs, Plaintiffs here have made specific allegations regarding the President's constitutional violations—namely his intrusion on Congress's Property Clause powers. Compl. ¶¶ 90–92.

In sum, because Plaintiffs challenge an executive action taken without statutory or constitutional authority, sovereign immunity never attached and need not be waived.[12]

## IV. Plaintiffs Do Not Need a Congressionally Bestowed Right of Action

Defendants next assert that Plaintiffs cannot challenge the President's *ultra vires* and unconstitutional action in court without an express, congressionally bestowed cause of action. Defs.' Br. 28–31. However, this argument runs counter to a long line of Supreme Court opinions, as well as this Court's decision in *League of Conservation Voters I. See* 303 F.Supp.3d at 994 ("[Because] Plaintiffs are not seeking to enforce a federal law … Plaintiffs do not need express Congressional authorization to maintain these causes of action.").

A "cause of action" simply means that a plaintiff has a legal right to a remedy. *See* Cause of Action, Black's Law Dictionary (12th ed. 2024) ("[A] factual situation that entitles one person to obtain a remedy in court."). While the APA currently provides such a right in most cases against the government, federal courts retain their pre-APA equitable authority to remedy "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This is true for actions claimed to be unconstitutional: "The ability to sue to enjoin unconstitutional actions by … federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* It is also true for *ultra vires* actions:

---

[12] Plaintiffs agree with Defendants that the district court decision in *Louisiana v. Biden*, No. 2:25-CV-71, 2025 WL 2808502 (W.D. La. Oct. 2, 2025), is not binding on this Court. *See* Defs.' Br. 26 n.12.

"Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958); *see also Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108–11 (1902) (pre-APA case enjoining government conduct without a statutory basis).[13] Congress may foreclose equitable relief in specific areas, but if it does not, the federal courts remain open to shield a plaintiff from an unconstitutional or *ultra vires* "injurious act by a public officer." *Armstrong*, 575 U.S. at 327 (citation omitted).

Consistent with this "long history of judicial review of illegal executive action," *id.* at 327, the Supreme Court routinely entertains claims for equitable relief to remedy unconstitutional and *ultra vires* executive acts without looking for any specific statutory cause of action. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489–91 (2010) (entertaining petitioners' separation-of-powers challenge to the formation of oversight board, despite absence of a statutory cause of action); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002) (entertaining petitioner's preemption claim against state officials for violation of federal statute, even though "the Act does not create a private cause of action"). The Supreme Court has never held that plaintiffs must show a congressionally bestowed cause of action to challenge *ultra vires* or unconstitutional acts by the executive branch, as Defendants now insist.

---

[13] When cases refer to the "availab[ility]" of "judicial relief," *e.g.*, *Harmon*, 355 U.S. at 581, they mean that the plaintiff has a cause of action.

PLS.' OPP. TO MOTS. TO DISMISS
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG

35

Case 3:25-cv-00038-SLG    Document 60    Filed 02/06/26    Page 43 of 49

Defendants err in their reliance on cases holding that when Congress creates new substantive rights by statute, it must also provide a cause of action before individuals may sue to enforce those rights against other parties. Defs.' Br. 28–29. In *Alexander v. Sandoval*, the Supreme Court held that plaintiffs could not sue to enforce federal disparate-impact regulations against state officials because Congress had evinced no intention of making the regulations privately enforceable. 532 U.S. 275, 285–93 (2001); *see also Ball v. Rodgers*, 492 F.3d 1094, 1104 (9th Cir. 2007) (holding that plaintiff may bring suit to enforce a federal statute only if Congress has provided a private right of action); *Lonberg v. City of Riverside*, 571 F.3d 846, 850 (9th Cir. 2009) (similar). Here, Plaintiffs do not seek to use a statutorily created substantive right as a sword. Rather, they seek an equitable remedy as a shield to protect their existing interests from unauthorized executive overreach.

Because Plaintiffs do not look to OCSLA or the APA as a source of private substantive rights, it is irrelevant whether those statutes contain "rights-creating language." *Sandoval*, 532 U.S. at 288 (cleaned up). *Contra* Defs.' Br. 28. Plaintiffs likewise do not seek to establish a cause of action under *Larson*, so Defendants' arguments attack a straw man. *See* Defs.' Br. 29. Rather, this case fits squarely in the long line of cases—affirmed in *Armstrong*, *McAnnulty*, and others—recognizing the availability of equitable remedies to prevent harm from unauthorized executive action.

Defendants contend that the Supreme Court has inferred a cause of action "only in instances where individual rights were being infringed," Defs.' Br. 30, but it is unclear

what that means. Plaintiffs and their members undeniably have legally protected interests in the enjoyment of public lands and the wildlife inhabiting them. *See supra* Argument I.B; *see also Lujan*, 504 U.S. at 560, 562–63 ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest…."). Defendants fail to explain why these rights differ from any other individual rights, or to substantiate their assertion that protection is limited to "personal property or liberty interests." *See* Defs.' Br. 30–31; *contra League of Conservation Voters I*, 303 F.Supp.3d at 994, 997–98 (finding plaintiffs' interests—identical to those here—to be protectable); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) (equitable remedies often appropriate to protect plaintiffs' environmental interests). Nor have courts limited their intervention to protecting plaintiffs from "threatened … enforcement proceeding[s]." Defs.' Br. 30; *see, e.g.*, *Harmon*, 355 U.S. at 582–83 ("judicial relief" available when agency withheld honorable discharge certificates without statutory basis); *McAnnulty*, 187 U.S. at 110 (granting "injunction to prohibit the [postmaster's] further withholding of the mail").

Defendants' are also incorrect that Plaintiffs seek a "new implied right of action for Property Clause violations." Defs.' Br. 31. Unlike the plaintiffs in *Armstrong*, who argued for a constitutional cause of action that would override statutory limitations on equitable remedies, *see* 575 U.S. at 328, Plaintiffs here invoke only the Court's existing equitable authority. To the extent Defendants suggest that Plaintiffs cannot enjoin executive action that runs afoul of separation-of-powers, their own cases show that the

Supreme Court has already rejected this argument: "If the Government's point is that …
[a] separation-of-powers claim should be treated differently than every other
constitutional claim, it offers no reason and cites no authority why that might be so."
*Free Enter. Fund*, 561 U.S. at 491 n.2. Accordingly, Defendants' argument is foreclosed
by Supreme Court precedent, and Plaintiffs need not show a congressionally granted
cause of action.

## V.  Plaintiffs Sued the Agencies for Purposes of Relief, Not to Challenge a Final Agency Action

Defendants again misstate Plaintiffs' claims when they argue that the supposed
lack of final agency action bars relief against the Secretaries of the Interior and
Commerce. Defs.' Br. 31–34. Yet Defendants' arguments are irrelevant because Plaintiffs
are not challenging any final agency action under the APA, which is the source of that
requirement. Rather, Plaintiffs have alleged that the President's issuance of the executive
order was *ultra vires* and unconstitutional. *See supra* Argument III (describing claims);
*see also* Compl. ¶¶ 87–98. Injunctive relief is available against subordinate agency
officials to prevent them from carrying out such actions. *Swan v. Clinton*, 100 F.3d 973,
979 (D.C. Cir. 1996) (finding that "injunctive relief against such [inferior] officials could
substantially redress [the plaintiff's] injury"); *Severino v. Biden*, 71 F.4th 1038, 1042–43
(D.C. Cir. 2023) (same); *League of Conservation Voters*, 303 F.Supp.3d at 995 (same).
Therefore, Plaintiffs' claims and request for relief are proper.

## CONCLUSION

As it has determined before, this Court may review and grant relief for President

Trump's attempt to revoke permanent protections for certain areas of the federal OCS.

Consequently, Plaintiffs respectfully request that the Court deny the motions to dismiss.


Respectfully submitted this 6th day of February, 2026.

/s/ George Torgun
George Torgun (*pro hac vice*)
Brettny Hardy (*pro hac vice*)
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T: (415) 217-2000
gtorgun@earthjustice.org
bhardy@earthjustice.org

Erik Grafe (AK Bar #0804010)
Hannah Payne Foster (AK Bar #2105045)
Earthjustice
310 K Street, Suite 508
Anchorage, AK 99501
T: (907) 277-2500
egrafe@earthjustice.org
hfoster@earthjustice.org

Eric P. Jorgensen (AK Bar #8904010)
Earthjustice
325 Fourth Street
Juneau, AK 99801
T: (907) 586-2751
ejorgensen@earthjustice.org

Stephen D. Mashuda (*pro hac vice*)
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
T: (206) 343-7340
smashuda@earthjustice.org

*Counsel for Plaintiffs Northern Alaska
Environmental Center, Alaska Wilderness
League, Oceana, Inc., Surfrider Foundation,
Center for Biological Diversity, Healthy Gulf,
Turtle Island Restoration Network, Greenpeace,
Inc., and Conservation Law Foundation*


Devorah Ancel (*pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
T: (415) 845-7847
devorah.ancel@sierraclub.org

*Counsel for Plaintiff Sierra Club*


Jaclyn H. Prange (*pro hac vice*)
Irene Gutierrez (*pro hac vice*)
Natural Resources Defense Council
111 Sutter St., Fl. 21
San Francisco, CA 94104
T: (415) 875-6100
jprange@nrdc.org
igutierrez@nrdc.org

*Counsel for Plaintiff Natural Resources Defense
Council*

Pls.' Opp. to Mots. to Dismiss
*N. Alaska Env't Ctr. et al. v. Donald J. Trump et al.*
Case No. 3:25-cv-00038-SLG
40

Case 3:25-cv-00038-SLG    Document 60    Filed 02/06/26    Page 48 of 49

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I hereby certify that this document contains 9,990 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 6th day of February, 2026.

/s/ George Torgun
George Torgun