IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants,<br><br>and<br><br>AMERICAN PETROLEUM INSTITUTE, *et al.*,<br><br>Intervenor-Defendants. | Case No. 3:25-cv-00038-SLG |

## ORDER OF DISMISSAL

Before the Court at Docket 57 is Federal Defendants' Motion to Dismiss for Lack of Jurisdiction.[1] Also before the Court at Docket 59 is Intervenor-Defendant State of Alaska's Motion to Dismiss for Lack of Jurisdiction. Plaintiffs filed a combined response in opposition to both motions at Docket 60.[2] Federal

[1] *See also* Docket 57-1 (Mem.). Federal Defendants are Donald J. Trump, in his official capacity as President of the United States; Doug Burgum, in his official capacity as Secretary of the Interior; and Howard Lutnick, in his official capacity as Secretary of Commerce. Docket 53 at ¶¶ 24-26.

[2] Plaintiffs are Northern Alaska Environmental Center; Alaska Wilderness League; Oceana, Inc.; Sierra Club; Surfrider Foundation; Healthy Gulf; Center for Biological Diversity; Turtle Island Restoration Network; Natural Resources Defense Council, Inc.; Greenpeace, Inc.; and

Defendants filed a reply in support of their Motion to Dismiss at Docket 61. Intervenor-Defendant the State of Alaska filed a reply in support of its Motion to Dismiss at Docket 62.[3]

Oral argument was not requested and was not necessary to the Court's determination.

## BACKGROUND

This case is about President Donald Trump's reversal of his predecessors' withdrawal of portions of the Outer Continental Shelf ("OCS") in the Arctic, Pacific, and Atlantic Oceans, and the former Gulf of Mexico,[4] from oil and gas leasing under Section 12(a) of the Outer Continental Shelf Lands Act ("OCSLA" or "the Act"), 43 U.S.C. § 1341(a).[5]

When Congress passed OCSLA in 1953, it had two stated purposes.[6] The

---

Conservation Law Foundation. Docket 53 at ¶¶ 9-19.

[3] American Petroleum Institute (API) is also an Intervenor-Defendant in this case, but API has not filed a brief regarding either motion.

[4] The Second Amended Complaint "refers to this area as the 'Gulf of Mexico' in accordance with the name in effect at the time all the relevant actions were taken and reflected on all relevant documents in this case." Docket 53 at 3 n.1. The Gulf of Mexico has been renamed the Gulf of America. The Court will refer to the Gulf as the Gulf of Mexico to be consistent with Plaintiffs' Second Amended Complaint, except when quoting a reference to the Gulf of America.

[5] Docket 53 at ¶ 1.

[6] Pub. L. No. 83-212, § 1, 67 Stat. 462 (1953) (codified at 43 U.S.C. § 1331 *et seq*.). OCSLA was amended in 1978. The 1978 amendments include the following purposes: (1) "[t]o establish a policy for the management of oil and natural gas in the Outer Continental Shelf"; (2) "to protect the marine and coastal environment;" (3) "to amend the Outer Continental Shelf Lands Act"; and (4) "for other purposes." Pub. L. No. 95-372, 92 Stat. 629, 629 (1978). Section 102 of the 1978 amendments lists ten, more detailed, purposes. Pub. L. No. 95-372, § 102, 92 Stat. 629, 631-32 (1978) (codified at 43 U.S.C. § 1802).

first purpose was "[t]o provide for the jurisdiction of the United States over" OCS lands.[7] The second purpose was "to authorize the Secretary of the Interior to lease such lands for certain purposes."[8] As relevant here, OCSLA authorized the Secretary of the Interior to "provide for the assignment or relinquishment of leases, for the sale of royalty oil and gas" on OCS lands.[9]

Consistent with these purposes, OCSLA establishes a four-stage process for the leasing of OCS lands for the development of oil or gas: (1) the Department of the Interior (the "Department") adopts a five-year program of proposed lease sales across the OCS; (2) the Department may—but generally is not required to—hold lease sales and issue leases in accordance with the five-year program; (3) the Department reviews the lessee's exploration plans; and (4) the Department, in consultation with state and local governments, reviews the lessee's development plans.[10]

Geological and geophysical (G&G) exploration activities on OCS lands are also permitted on unleased lands and lands under lease to a third party.[11] G&G

[7] § 1, 67 Stat. at 462.

[8] § 1, 67 Stat. at 462.

[9] § 5(a), 67 Stat. at 464 (currently codified at 43 U.S.C. § 1334).

[10] 43 U.S.C. §§ 1337(a), 1340, 1344, 1351; *see also Native Vill. of Point Hope v. Jewell,* 740 F.3d 489, 493 (9th Cir. 2014).

[11] *See* 43 U.S.C. § 1340; 30 C.F.R. § 551.2 (identifying that the "purpose of this part" of federal regulations is "[t]o allow you to conduct G&G activities in the OCS related to oil, gas, and sulphur on unleased lands or on lands under lease to a third party"); 30 C.F.R. § 551.1 (defining exploration to include "[g]eological and geophysical marine and airborne surveys where magnetic, gravity, seismic reflection, seismic refraction, gas sniffers, coring, or other systems

exploration activities, such as seismic surveys, can only occur after the proponent of a survey obtains the necessary federal permits, which are subject to environmental and other procedural requirements.[12]

Section 12(a) of OCSLA provides as follows: "The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."[13] In 2015 and 2016, President Barack Obama issued three memoranda and one executive order withdrawing certain areas of the OCS from leasing, including areas in the Arctic's Northern Bering, Beaufort, and Chukchi Seas.[14] After President Trump took office, on April 28, 2017, he issued Executive Order 13795, which purported to revoke the 2015 and 2016 withdrawals.[15]

After another change in presidential administration, in January 2021 President Joe Biden issued Executive Order 13990, which revoked President

---

are used to detect or imply the presence of oil, gas, or sulphur; and . . . [a]ny drilling, whether on or off a geological structure").

[12] *See* 43 U.S.C. § 1340; 30 C.F.R. § 551.4(a); *see generally* 30 C.F.R. pt. 551.

[13] § 12(a), 67 Stat. at 469 (codified at 43 U.S.C. § 1341(a)); *see also* Docket 53 at ¶¶ 2, 29.

[14] Docket 53 at ¶¶ 66-68; Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf Offshore Alaska From Leasing Disposition, DCPD201500059 (Jan. 27, 2015); Exec. Order No. 13754, 81 Fed. Reg. 90669, § 3 (Dec. 9, 2016); Memorandum on Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf From Mineral Leasing, DCPD201600860 (Dec. 20, 2016); Memorandum on Withdrawal of Certain Areas off the Atlantic Coast on the Outer Continental Shelf From Mineral Leasing, DCPD201600861 (Dec. 20, 2016).

[15] Exec. Order No. 13795, 82 Fed. Reg. 20815 (Apr. 28, 2017); *League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013 (2019), *vacated and remanded sub nom. League of Conservation Voters v. Biden*, 843 F. App'x 937 (2021); *see also* Docket 53 at ¶¶ 3, 72.

Trump's Executive Order 13795 and reinstated President Obama's withdrawals of portions of the OCS in the Arctic Ocean from leasing.[16] On March 13, 2023, President Biden added protections for the Beaufort Sea in Alaska,[17] and on January 6, 2025, he issued memoranda withdrawing portions of the Pacific and Atlantic Oceans, Eastern and Central Gulf of Mexico ("GOM"), and Northern Bering Sea pursuant to Section 12(a).[18]

Concurrently, and in accordance with OCSLA, in December 2023, the Department approved the 2024-2029 National OCS Oil and Gas Leasing Program (the "Program").[19] The Program provided for three potential OCS oil and gas lease sales in the GOM—in 2025, 2027, and 2029—to include "the Western GOM Planning Area and the portions of the Central and Eastern GOM planning areas not currently under Presidential withdrawal."[20]

---

[16] Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021); *see also* Docket 53 at ¶ 4.

[17] Docket 57-3; *see also* Docket 53 at ¶¶ 4, 77.

[18] Withdrawal of Certain Areas of the United States OCS from Oil or Natural Gas Leasing, 90 Fed. Reg. 6739 (Jan. 17, 2025); Withdrawal of Certain Areas of the United States OCS from Oil and Natural Gas Leasing, 90 Fed. Reg. 6743 (Jan. 17, 2025); *see also* Docket 53 at ¶¶ 4, 78. The Memoranda are dated January 6, 2025 and were published in the Federal Register on January 17, 2025.

[19] Bureau of Ocean Energy Management, 2024-2029 National Outer Continental Shelf Oil and Gas Leasing Proposed Final Program (Sep. 2023), available at https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/2024-2029_NationalOCSProgram_PFP_Sept_2023_Compliant.pdf (last visited Aug. 24, 2026) [hereinafter 2024-2029 Final Program]; Memorandum from Elizabeth Klein, Director, Bureau of Ocean Energy Management, to the Secretary of the Department of the Interior (Dec. 1, 2023), as signed by the Secretary of the Interior on December 14, 2023, available at https://www.boem.gov/oil-gas-energy/decision-memo-national-program-signed (last visited Aug. 24, 2026).

[20] 2024-2029 Final Program at 3; *see* Docket 53 at ¶ 56 ("The current five-year OCS leasing

On January 20, 2025, President Trump, after again taking office, issued Executive Order 14148, which purported to rescind President Biden's withdrawals.[21] Also on January 20, 2025, President Trump issued Executive Order 14154, titled "Unleashing American Energy," which states: "It is the policy of the United States . . . to encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf, in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future."[22]

In February 2025, to implement these executive orders, the Secretary of the Interior, Doug Burgum, issued Secretarial Orders 3420 and 3417.[23] Secretarial Order 3420 "instruct[ed] that 'Bureaus and Offices are to take all actions available to expedite the leasing of the OCS for oil and gas exploration and production.'"[24] Secretarial Order 3417 "direct[ed] all Bureaus and Offices of the Department to

---

program, which runs from 2024-2029," provides for "three sales in the Western and Central [GOM].").

[21] Exec. Order No. 14148, 90 Fed. Reg. 8237, 8240 (Jan. 20, 2025); *see also* Docket 53 at ¶¶ 5, 82.

[22] Exec. Order No. 14154, 90 Fed. Reg. 8353, 8353 (Jan. 29, 2025); *see also* Docket 53 at ¶ 58. The Executive Order was issued on January 20, 2025, and published in the Federal Register on January 29, 2025.

[23] Docket 53 at ¶¶ 83-84.

[24] Docket 53 at ¶ 83 (quoting Secretary of the Interior, Secretarial Order No. 3420, *Announcing President Trump's Revocation of Former Outer Continental Shelf Withdrawals* (Feb. 3, 2025), available at https://www.doi.gov/document-library/secretary-order/so-3420-announcing-president-trumps-revocation-former-outer (last visited Aug. 24, 2026)).

‘identify the emergency authorities available to them, as well as all other legal authorities, to facilitate the identification, permitting, leasing, development, production, transportation, refining, distribution, exporting, and generation of domestic energy resources and critical minerals including, but not limited to, on Federal lands and the Outer Continental Shelf.’”[25]

In April 2025, the Department of the Interior announced that it was initiating a process to develop a new five-year leasing program to include a new OCS planning area in the High Arctic and published a notice requesting public comment.[26] The new program “may supplant the current one” and the “Secretary’s First Proposal includes 21 sales in the Alaska Region, 7 in the Gulf of America, and 6 in the Pacific Region,” with “[s]ome of those proposed sales” potentially “occur[ing] in areas that were withdrawn by President Biden, but reopened for leasing by President Trump.”[27]

---

[25] Docket 53 at ¶ 84 (quoting Secretary of the Interior, Secretarial Order No. 3417, *Addressing the National Energy Emergency* (Feb. 3, 2025), available at https://www.doi.gov/document-library/secretary-order/so-3417-addressing-national-energy-emergency).

[26] Docket 53 at ¶¶ 61-62, 86; Request for Information and Comments on the Preparation of the 11th National Outer Continental Shelf Oil and Gas Leasing Program MAA104000, 90 Fed. Reg. 17972 (Apr. 30, 2025).

[27] Docket 57-1 at 17 (citing Bureau of Ocean Energy Management, Details of the Secretary’s 1st Proposal, available at https://www.boem.gov/oil-gas-energy/national-program/details-secretarys-1st-proposal (last visited Aug. 24, 2026) (proposing a lease sale in the Beaufort Sea Program Area in 2026 and additional lease sales in various program areas from 2027 to 2031)); *see* Docket 53 at ¶ 86 (citing Request for Information and Comments on the Preparation of the 11th National Outer Continental Shelf Oil and Gas Leasing Program MAA104000, 90 Fed. Reg. at 17974 (providing that “[w]ith the initiation of a new National OCS Program development process and, with it, the renewed potential for a lease sale in the Atlantic region, BOEM may receive new G&G permit applications in the near future”)).

Plaintiffs also allege that on July 4, 2025, President Trump signed Public Law No. 119-21, titled the One Big Beautiful Bill Act, and that Section 50102(a) of that act requires the Department of the Interior "to conduct a minimum of 30 region-wide lease sales in the Gulf between 2025 and 2040, with each lease sale at least 80 million acres in size," and "at least 6 lease sales in the Cook Inlet region of Alaska between 2026 and 2032, with each lease sale at least 1 million acres in size."[28]

Plaintiffs filed this lawsuit challenging President Trump's rescission of President Obama and President Biden's withdrawals of federal offshore areas from OCS oil and gas leasing.[29] Plaintiffs allege that the rescission violates the Property Clause of the Constitution and is *ultra vires* because, in their view, Section 12(a) "authorizes the President to withdraw unleased lands of the [OCS] from disposition" but "[n]either OCSLA nor any other statute authorizes the President to re-open for disposition areas withdrawn under OCSLA Section 12(a)."[30] As relief, Plaintiffs seek (1) a declaratory judgment finding that Executive Order 14148 violates the Constitution; (2) injunctive relief prohibiting Federal Defendants from

---

[28] Docket 53 at ¶ 63. The Court notes that the Cook Inlet region is a separate Program Area and it was not subject to the withdrawals by either President Obama or President Biden. As for the lease sales in the Gulf of Mexico, Plaintiffs do not allege whether any of the lease sales mandated by Section 50102(a) involve OCS land that was withdrawn by either President Obama or President Biden.

[29] Docket 1. Plaintiffs filed a Second Amended Complaint, which is the operative complaint, on October 24, 2025. Docket 53.

[30] Docket 53 at ¶¶ 87-98.

implementing Executive Order 14148; and (3) injunctive relief enjoining Federal Defendants from complying with Executive Order 14148.[31]

Federal Defendants and the State of Alaska each now move to dismiss this action, maintaining that Plaintiffs lack standing and their claims are not ripe.[32] Plaintiffs disagree, contending that their "allegations easily clear the 'low bar to establish their standing at the pleading stage.'"[33]

## LEGAL STANDARD

A plaintiff's lack of standing necessitates dismissal under Federal Rule of Civil Procedure 12(b)(1). "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."[34]

"A Rule 12(b)(1) jurisdictional attack may be facial or factual."[35] "A factual attack on jurisdiction 'contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings.'"[36] "A 'facial attack,' by contrast 'accepts the truth of the plaintiff's allegations but asserts that they "are insufficient

---

[31] Docket 53 at 51-52.

[32] Docket 57-1 at 19.

[33] Docket 60 at 21 (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 622 (D.C. Cir. 2017)).

[34] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992) (emphasis omitted) (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)).

[35] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

[36] *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 n.6 (9th Cir. 2024) (quoting *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)).

on their face to invoke federal jurisdiction.'"[37] When resolving a factual attack on jurisdiction, a court "need not presume the truthfulness of the plaintiff's allegations."[38]

## DISCUSSION

"To satisfy Article III's case or controversy requirement, a plaintiff must establish that she has standing to invoke the jurisdiction of the federal courts."[39] "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."[40] At the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [a court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim."[41] "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that

---

[37] *Id.* (quoting *Leite*, 749 F.3d at 1121).

[38] *Safe Air for Everyone*, 373 F.3d at 1039.

[39] *Bowen*, 118 F.4th at 1142 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

[40] *TransUnion LLC*, 594 U.S. at 423 (citing *Lujan*, 504 U.S. at 560-61).

[41] *Lujan*, 504 U.S. at 561 (internal quotation marks omitted) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

the injury is 'certainly impending.'"[42] "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'"[43]

Federal Defendants raise both facial and factual attacks on Plaintiffs' standing based on the Second Amended Complaint.[44] Plaintiffs contend that Federal Defendants' "jurisdictional challenge is a facial one" because the statements provided in a declaration by Federal Defendants "do not contradict any of Plaintiffs' allegations."[45] However, the Court finds that Federal Defendants' challenge to Plaintiffs' standing as to the imminence of any future threatened injury is a factual challenge. The Court therefore "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to

---

[42] *Id.* at 564 n.2 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

[43] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

[44] Docket 57-1 at 18 n.5 ("Defendants' motion is brought both as a factual and facial challenge. To the extent the Defendants challenge Plaintiffs' assertions of imminent harm with factual information in the standing and ripeness arguments in sections I and II of the Argument section, it is a factual challenge. Otherwise, it is a facial challenge."); *see also* Docket 61 at 7 ("Plaintiffs incorrectly assert that Defendants' jurisdictional challenge to their Complaint is only facial, not factual.").

[45] Docket 60 at 20. The State's Motion to Dismiss does not specify whether it brings a facial or factual attack on Plaintiffs' standing, but it suggests that the State raises only a facial challenge. *See* Docket 59-1 at 2 ("The State of Alaska moves to dismiss this case for lack of standing because Plaintiffs have not alleged imminent and particularized harm within the District of Alaska."); Docket 62 at 2 ("Alaska's motion to dismiss for lack of jurisdiction asks whether Plaintiffs' Complaint has sufficiently established that the challenged Executive Orders have caused 'injury in fact' to Plaintiffs' members within the District of Alaska, whether that claimed injury in fact is fairly traceable to the challenged Executive Orders, and is likely to be redressed by a favorable decision of this Court.").

resolve factual disputes concerning the existence of jurisdiction."[46]

Federal Defendants assert that "Plaintiffs have failed to demonstrate any imminent harm to their interests caused by President Trump's rescission of the OCS withdrawals."[47] According to Federal Defendants, "even without President Biden's withdrawals, much of the area subject to those withdrawals remains withdrawn pursuant to earlier actions by President Trump;" these areas include "the Eastern [GOM], South Atlantic and Straits of Florida Planning Areas, and the North Carolina portion of the Mid-Atlantic Planning Area," all of which "will remain withdrawn through June 2032."[48] And while Federal Defendants acknowledge that "some areas in the Mid-Atlantic, North Atlantic, and the Pacific are no longer withdrawn due to President Trump's 2025 Order," they contend that the Second Amended Complaint "contains no allegations of any future oil and gas activity in these areas, let alone any imminent activity, that would affect their interests."[49]

As for the areas in the Arctic that were withdrawn by President Biden, Federal Defendants contend that—beyond "generally describ[ing] the environment

---

[46] *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

[47] Docket 57-1 at 19.

[48] Docket 57-1 at 23 (citing Bureau of Ocean Energy Management, Leasing, Areas Under Restriction, available at https://www.boem.gov/oil-gas-energy/leasing/areas-under-restriction (last visited Aug. 24, 2026)) (listing three 2020 Presidential Memoranda, all expiring in 2032, that withdraw OCS lands in the South Atlantic and Straits of Florida Planning Areas, the North Carolina portion of the Mid-Atlantic Planning Area, and portions of the Central and Eastern GOM Planning Areas).

[49] Docket 57-1 at 23-24.

in those areas, prior oil and gas activity, and potential future activity"—Plaintiffs fail to identify "any actual activities, or even activities proposed and pending approval, that may cause them harm."[50]

Additionally, Federal Defendants note that "even for those areas no longer subject to any other prior withdrawal—i.e., the Mid-Atlantic, North Atlantic, Pacific, and Arctic—any actual oil and gas development is likely at least a couple of years away because they are not part of [the Bureau of Ocean Energy Management's ("BOEM")] 2024-2029 National OCS Program."[51] Federal Defendants add that "[w]hile it is true that the administration has announced a draft proposed Program that could potentially offer some of the previously withdrawn areas in future sales, no Program has yet been approved."[52]

The State of Alaska asserts that Plaintiffs have made "no allegations demonstrating imminent harm" as they have not alleged that there is "a particular exploration project or [National Marine Fisheries Service] permit within any previously withdrawn areas of the Alaska OCS that poses imminent harm to their members today."[53] The State maintains that "the generalized harms Plaintiffs have alleged in the relevant and immense geographic area of the Alaska OCS differ

---

[50] Docket 57-1 at 24.

[51] Docket 57-1 at 25.

[52] Docket 57-1 at 25.

[53] Docket 59-1 at 3.

from other areas, such as the Atlantic Ocean or Gulf of America, and should not be conflated. Moreover, the alleged harm that Plaintiffs fear in Alaska is predicated on future scenarios that have not yet occurred, nor are they allowed under the current National OCS Oil and Gas Leasing Program, which does not authorize exploration or leasing in previously purportedly withdrawn areas of the Alaska OCS."[54]

In response to Federal Defendants' and the State's assertions that Plaintiffs lack standing, Plaintiffs maintain that they have shown "imminent harm" based on President Trump's revocation of President Biden's withdrawals of OCS acreage and other executive actions to encourage energy exploration and production on OCS lands, and Secretary Burgum's implementation of those executive actions.[55] Plaintiffs also note that industry groups have "expressed significant interest in OCS exploration and development" and seismic surveys "can now occur in reopened OCS areas."[56] Plaintiffs point out that seismic surveys are often conducted two to four years prior to any OCS lease sale, as companies may seek to conduct seismic surveys even in areas that are not included in an existing or proposed five-year program.[57]

---

[54] Docket 59-1 at 3-4.

[55] Docket 60 at 27-28.

[56] Docket 60 at 29-30 (citing Docket 53 at ¶¶ 44-47).

[57] Docket 53 at ¶ 44.

Plaintiffs also contend that the past practices by President Trump and others during his first administration "confirm[] the immediacy of the threat"; specifically, when President Trump revoked President Obama's withdrawals in 2017, the Department of "Interior called for expedited consideration of seismic survey permits" and "at least six seismic operation companies applied for permits to conduct deep-penetration seismic surveys, while at least one company applied for a permit to conduct a seismic survey in federal waters."[58] Further, in their opposition brief, Plaintiffs point to Federal Defendants' announcement that they intend to develop and adopt a new, more expansive five-year leasing program by November 2026 that would supplant the current Program, open previously withdrawn areas of the OCS to oil and gas leasing, and propose a lease sale in the Beaufort Sea Program Area in late 2026.[59]

In support of their contention that they have shown imminent harm, Plaintiffs rely on *League of Conservation Voters*.[60] In that case, the plaintiffs challenged Executive Order 13795, which President Trump issued in April 2017, purporting to reverse President Obama's withdrawals of OCS lands in the Arctic and Atlantic Oceans from oil and gas leasing.[61] There, unlike here, the federal defendants

---

[58] Docket 60 at 30 (citing Docket 53 at ¶¶ 52, 73).

[59] Docket 60 at 31-32.

[60] Docket 60 at 31. *See also* Docket 53 at ¶¶ 61, 62.

[61] *League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985, 990 (D. Alaska 2018), *vacated as moot sub nom. League of Conservation Voters v. Biden*, 843 F. App'x 937 (9th Cir. 2021).

asserted only a facial attack that the plaintiffs "have not alleged an imminent harm sufficient to confer Article III standing."[62]

Because the federal defendants had asserted only a facial challenge to the court's jurisdiction, the court accepted as true the plaintiffs' allegations to determine whether the allegations were sufficient as a legal matter to find standing.[63] One such allegation was "that one seismic operator has already 'sought federal authorizations to conduct 3-D seismic exploration in the Beaufort Sea nearshore area' . . . ."[64] The plaintiffs had also alleged that at least six seismic operation companies had applied for permits to conduct seismic surveys in the Atlantic Ocean. Based on these allegations, the court held that the plaintiffs' "Complaint adequately alleges a risk of imminent harm from seismic surveying for purposes of Article III standing."[65]

The Court finds that this case is distinguishable from *League of Conservation Voters*. First, Federal Defendants here raise a factual attack, not solely a facial one, and therefore the Court "need not presume the truthfulness of the plaintiff's allegations."[66] With their Motion to Dismiss, Federal Defendants filed

---

[62] *Id.* at 996.

[63] *Id.* at 992.

[64] *Id.* at 998.

[65] *Id.*

[66] *Safe Air for Everyone*, 373 F.3d at 1039.

a declaration by Dr. Megan Carr, the Associate Director of the Strategic Resources Program at BOEM.[67] According to Dr. Carr's declaration, dated January 15, 2026, "[t]he only areas of the OCS where there are current and pending applications to conduct [geological and geophysical ("G&G")] exploration activities related to oil and gas are in the Western and Central Gulf of America."[68] Dr. Carr avers that "there are no ongoing or pending applications to conduct G&G exploration activities in federal waters offshore Alaska, the U.S. Pacific coast, the Eastern Planning Area of the Gulf of America, or the U.S. Atlantic Coast, including Florida."[69] Further, Dr. Carr states that a March 2018 request for comment from industry groups regarding interest in leasing OCS lands in the Beaufort Sea Planning Area garnered only one response; "BOEM did not proceed with the proposed Beaufort Sea lease sale and has not received any further expressions of interest from industry in this area."[70]

The Second Amended Complaint alleges that the State of Alaska's 2024 Beaufort Sea lease sale in state offshore waters drew 33 bids and resulted in 20 leases at an estimated bid bonus value of over $9 million.[71] The Second Amended

---

[67] Docket 57-2.

[68] Docket 57-2 at ¶ 3.

[69] Docket 57-2 at ¶ 3.

[70] Docket 57-2 at ¶ 4.

[71] Docket 53 at ¶ 49.

Complaint also alleges that, in August 2025, the National Marine Fisheries Service "issued an incidental harassment authorization to a company planning to conduct drilling and shallow hazard seismic surveying in the coming year in state waters adjacent to federal OCS areas in the Beaufort Sea."[72] However, these factual allegations do not contradict Dr. Carr's declaration that there are no pending applications for G&G exploration activities in any waters outside the Western and Central GOM.

Thus, unlike in *League of Conservation Voters*, Plaintiffs' Second Amended Complaint contains no allegations of imminent seismic surveying in the previously withdrawn OCS lands, and Dr. Carr's unrebutted declaration demonstrates that there are no pending applications for G&G exploration in any OCS lands outside the Western and Central GOM. And while the executive actions that Plaintiffs describe indeed show that expediting oil and gas exploration and development on OCS lands is an executive priority, the Court finds these actions alone are insufficient to demonstrate that future injury to Plaintiffs is "certainly impending."[73] While Federal Defendants have begun the regulatory process to adopt a new leasing program under the OCSLA, that process is currently in the proposal stage, with at least two additional notice and public comment periods before any program

[72] Docket 53 at ¶ 49.

[73] *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5).

approval.[74] Plaintiffs have not refuted Federal Defendants' representation that "it will likely take over a year for a new five-year program to be finalized."[75]

Plaintiffs also maintain that "the fact that such oil and gas development is not occurring immediately does not prevent a showing of imminent harm," relying on *San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Commission*.[76] In *Mothers for Peace*, Pacific Gas & Electric Co. ("PG&E") sought to renew its initial 40-year license to operate two nuclear power units at Diablo Canyon.[77] However, when PG&E applied for the license renewal, the deadline to qualify for continued operation during the Nuclear Regulatory Commission's ("NRC") review of the license renewal had passed.[78] PG&E sought an exemption from the deadline, which NRC granted.[79]

Three organizations concerned with the dangers posed by nuclear power sued, challenging NRC's grant of the exemption and PG&E's continued operation of the nuclear power units.[80] NRC argued that the plaintiffs lacked standing due

[74] *See* Bureau of Ocean Energy Management, National OCS Oil and Gas Leasing Program, available as https://www.boem.gov/oil-gas-energy/national-program/national-ocs-oil-and-gas-leasing-program (last visited Aug. 24, 2026).

[75] Docket 61 at 14.

[76] Docket 60 at 32 (citing *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 100 F.4th 1039, 1054 (9th Cir. 2024)).

[77] *Mothers for Peace*, 100 F.4th at 1044.

[78] *Id.*

[79] *Id.*

[80] *Id.*

to a failure to show an actual and imminent injury.[81] NRC maintained that the plaintiffs had "raise[d] only the speculative possibility of future risks of natural disaster or operational accident at the Diablo Canyon facility as there will be no changes in the way Diablo Canyon operates."[82]

The Ninth Circuit disagreed. The Circuit Court noted that NRC itself "recognized that age-related degradation of nuclear facilities may lead to safety and environmental risks beyond the initial 40-year license term."[83] Referring to NRC's own guidance documents, the Ninth Circuit held that "the likelihood of at least one of Diablo Canyon's nuclear power units continuing operations past its initial 40-year license term is almost guaranteed, not speculative."[84] Therefore, the Circuit Court held that the plaintiffs had "alleged a non-speculative potential harm from age-related safety and environmental risks" and "shown that under the Exemption Decision, Diablo Canyon will in all likelihood continue operations beyond its initial 40-year license term while NRC completes review of a license renewal application."[85] And because the plaintiffs had also alleged—and NRC conceded—that their members faced a realistic threat of harm should an incident

[81] *Id.* at 1054.

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.* at 1055.

occur—the Ninth Circuit held that the plaintiffs' alleged "harm does not 'lie[] at the end of a highly attenuated chain of possibilities,' but rather is a 'credible threat' that qualifies as an actual and imminent harm."[86]

In reaching its decision, the Circuit Court explained that "[t]his is not a situation in which multiple steps are required before the alleged harm may come into being."[87] The Circuit distinguished *South Carolina v. United States*, a case in which the Fourth Circuit held that South Carolina's alleged injury—that it would become "the permanent repository of weapons-grade plutonium"—was "too speculative to give rise to a sufficiently concrete injury-in-fact."[88] That was because, for South Carolina's alleged injury to materialize, a "highly attenuated chain of possibilities" had to occur: "(1) the proposed [alternative nuclear waste disposal] method must fail; (2) the Department of Energy must fail to identify an alternative method for disposing of the nuclear material; and (3) the Department of Energy must breach its statutory obligation to remove the nuclear material from South Carolina, Congress must repeal that obligation, or the courts must refuse to enforce that obligation."[89]

---

[86] *Id.* (alteration in original) (internal quotation marks and citation omitted) (first quoting *South Carolina v. United States*, 912 F.3d 720, 727 (4th Cir. 2019); and then quoting *Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013)).

[87] *Id.* at 1054 (first citing *Munns v. Kerry*, 782 F.3d 402, 409-10 (9th Cir. 2015); and then citing *South Carolina*, 912 F.3d at 727-28).

[88] *South Carolina*, 912 F.3d at 728.

[89] *Id.* at 728-29.

The Court finds that this case is more similar to *South Carolina* than to *Mothers for Peace* such that Plaintiffs have failed to establish that there is a substantial risk of imminent harm. In *Mothers for Peace*, the nuclear power plant would continue operating past its 40-year licensed term while NRC reviewed PG&E's request for a renewed license, posing a non-speculative potential harm from age-related degradation.[90] Thus, the plaintiffs had adequately alleged a credible threat of actual and imminent harm.[91] In contrast, any exploration or leasing on OCS federal lands implicated by President Trump's revocations of President Obama and President Biden's withdrawals is not imminent. While it appears likely that Federal Defendants plan to permit oil exploration and development in at least some of the withdrawn areas, like the alleged harm in *South Carolina*, "multiple steps are required before the alleged harm may come into being."[92] Presently, the Court can only speculate as to whether any of the previously withdrawn OCS acreage will be included in any new oil and gas leasing program or proposed lease sale. Further, the undisputed facts show that there are no pending applications to perform G&G exploration activities in any OCS waters outside the Western and Central GOM, and Plaintiffs' Second Amended Complaint does not allege that there were any pending or imminent G&G exploration activities

[90] *Mothers for Peace*, 100 F.4th at 1054-55.

[91] *Id.*

[92] *Id.* at 1054 (citing *South Carolina*, 912 F.3d at 727-28).

in any of the federal OCS lands that have been withdrawn. Therefore, the Court finds that Plaintiffs' alleged harm is not sufficiently imminent for standing purposes to confer jurisdiction on this Court when this action was initiated.[93] As such, Federal Defendants' Motion to Dismiss at Docket 57 is GRANTED.[94]

**CONCLUSION**

In light of the foregoing, it is HEREBY ORDERED:

- Federal Defendants' Motion to Dismiss at Docket 57 is **GRANTED**;
- The State of Alaska's Motion to Dismiss at Docket 59 is **DENIED** as moot;
- This case is **DISMISSED** without prejudice; and
- The Clerk of Court is directed to enter a final judgment and close this case.

DATED this 24th day of August, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

[93] *See Mothers for Peace*, 100 F.4th at 1054.

[94] Federal Defendants also argue that Plaintiffs' claims are not yet ripe for judicial review; that President Trump has sovereign immunity from suit on Plaintiffs' claims; that Plaintiffs have no right of action to bring their claims; and that there is no final agency action that is reviewable under the Administrative Procedure Act. Docket 57-1 at 25-42. Because the Court agrees with Federal Defendants that Plaintiffs have not shown that any alleged harm is imminent sufficient to confer standing, the Court does not address these additional asserted bases for dismissal.